# 𝕾taunton

BENJAMIN D. RITHOLZ, AND OTHERS V. COMMONWEALTH
OF VIRGINIA, ETC.

September 5, 1945.

Record No. 2919.

Present, All the Justices.

340

342

The opinion states the case.

*Peyton, Beverley, Scott & Randolph,* for the appellants.

*Abram P. Staples, Attorney General, Beecher E. Stallard, William M. Tuck, Archibald G. Robertson* and *Hunton, Williams, Anderson, Gay & Moore,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

The Commonwealth of Virginia, at the relation of B. R. Bell, Roger C. Wheeler, L. E. Rayhorn, H. E. Cross and E. E. Crawford, composing the Virginia State Board of Examiners in Optometry, instituted these proceedings under the provisions of the Virginia declaratory judgment statutes (Code 1942 (Michie), secs. 6140a-6140h) against Benjamin D. Ritholz, Morris I. Ritholz, Samuel J. Ritholz, Sylvia Ritholz, Sophie Ritholz and Fannie Ritholz, partners trading and doing business under the firm name of National Optical Stores Company.

The bill charged that an actual controversy had arisen between the complainant and respondents, involving the constitutionality and the construction of Code 1942 (Michie), secs. 1624-1638, inclusive, as amended, dealing with the practice of optometry; and that respondents were engaged in the unlawful practice of optometry in Virginia and fraudulently evading and violating the sections enumerated. The prayer of the bill was that the respective rights, duties, obligations and privileges of complainant and respondents under the statutes be ascertained and declared, that the statutes be held constitutional, and that the respondents be enjoined from further violation of the law.

The respondents gave notice to B. R. Bell, Roger C. Wheeler, L. E. Rayhorn, H. E. Cross and E. E. Crawford, "allegedly functioning as the Virginia State Board of Examiners in Optometry," that on the 17th day of August, 1942, they would file a petition and bond for removal of the cause to the United States District Court for the Eastern District of Virginia at Richmond. The petition for removal alleged (1) that "the said action is of a civil nature arising under the Constitution and laws of the United States", and that, if the contention of the complainant be sustained, respondents would be deprived of their property without due process of law and would be deprived of the equal protection of the Constitution and laws of the United States; (2) that the controversy was between citizens of different

states, in that the members of the State Board of Examiners in Optometry were citizens of Virginia and all the respondents were citizens of Illinois; and (3) that the value of the matter in controversy was in excess of the sum or value of $3,000, exclusive of interest and costs. It was further al-, leged that, while the suit was in the name of the Commonwealth of Virginia, the members of the Virginia State Board of Examiners in Optometry were without authority to institute it on behalf of the Commonwealth of Virginia, and hence the suit was simply a controversy between citizens of different states.

The trial court overruled the motion to remove the cause to the Federal court, retained jurisdiction, adjudicated that the optometry acts were constitutional, found as a fact that respondents were engaged in the unlawful practice of optometry in Virginia, and enjoined them from further violation of the law. From a decree so declaring, this appeal was obtained.

The first question presented in the nineteen assignments of error is whether the case should have been removed to the Federal court.

This question is complicated and perplexing. When a *prima facie* case is made by proper pleadings, it is the duty of the State court to yield jurisdiction to the Federal court. Ordinarily, issues of fact must be determined by the Federal court on motion to recommit the case to the State court. Respondents contend that a Federal question appears from complainant's statement of the case in the bill. Complainant denies that any such question is set forth in the bill. These contentions require a close scrutiny of the bill itself.

In the first paragraph of the bill, it is stated: "Commonwealth of Virginia * * * brings this suit to obtain a temporary restraining order and an interlocutory and permanent injunction restraining the respondents herein from the unlawful practice of optometry and the fraudulent evasion and violation of the Virginia Optometry law in contravention of the public policy of the Commonwealth of Virginia;

\* \* \* to obtain a declaratory judgment and decree of this Court adjudicating the aforesaid Virginia optometry law to be *in all respects constitutional,* and declaring the respective rights, duties and privileges of the parties hereto under the said Virginia optometry law respecting the matters and things hereinafter set forth insofar as the said optometry law is applicable to said complainant and respondents." (Italics supplied.)

One of the prayers of the bill is: "That upon final hearing the Court adjudge that the aforesaid Sections 1624-1638, both inclusive, of the Virginia Code of 1936, as amended, are *constitutional and valid* and that the Court thereupon make the aforesaid temporary injunction permanent and perpetual." (Italics supplied.)

The parties differ as to the meaning of the terms, "in all respects constitutional," used in the opening paragraph, and "constitutional and valid," used in the prayer.

The dominant question presented by complainant is the construction of the statute involved as applied to the activities of respondents in Virginia. It is not clear whether complainant intended to refer to the Constitution of Virginia or to it and the Federal Constitution. These doubts seem to be resolved by the Federal courts against removal. "Not only must the fact of the involvement of a federal question appear in the plaintiff's pleading, but the allegation must be real and substantial, and it must appear from the complaint that in some aspect which the case may assume a federal question will be involved, and that it is set up in good faith. If there is any doubt as to the right to remove, the doubt must be resolved against the federal jurisdiction. The right of removal is not given by a statement, by anticipation, of a possible defense depending upon a federal question, for the showing of a federal question in the complaint must be unaided by anything alleged in anticipation of defenses which may be interposed." Hughes' Federal Practice, sec. 2318, pp. 84-85. " \* \* \* ; and it is settled that a petition for removal on the ground of a federal question

cannot prevail if the federal question does not appear in the plaintiff's pleading, for the want of it cannot be supplied by averments in the petition." Hughes' Federal Practice, sec. 2524, p. 277.

In 45 Am. Jur. 836, it is said: "To bring a case within the statute, a right or immunity created by the Constitution, laws, or treaties of the United States must be an element, and an essential one, of the plaintiff's cause of action. It is not enough to justify removal that in the progress of the suit it may be necessary to give a construction to the Constitution or laws of the United States."

At page 909, it is also said: "A Federal question must generally be disclosed by the plaintiff's statement of his cause of action, and where it is not thus shown, it cannot be made to appear by allegations in the petition for removal. * * * ."

We base our conclusion that the case is not removable on the ground that it does not appear from the complainant's statement of her case by a clear and necessary intendment that a Federal question is involved. The respondents have injected a Federal question, hence they have an opportunity to have their contentions reviewed by the Federal court of last resort.

Respondents contend that the individuals composing the Virginia State Board of Examiners in Optometry were without authority to bring the suit in the name of the Commonwealth of Virginia at their relation; that, if any one had the authority to bring the suit, it was the individuals, all citizens of Virginia; and that, since the respondents were all citizens of the State of Illinois, the case was removable on the ground of diversity of citizenship.

The Commonwealth, as a political entity, has a right, independent of statute, to institute a suit in the various courts. Code, sec. 1637, provides that any violation of the statutes regulating the practice of optometry shall be a misdemeanor, states the penalties and further provides: "It shall be the duty of the respective Commonwealth's attorneys to pros-

ecute all cases arising under this section, but the board may employ additional counsel from time to time when necessary upon recommendation of the Attorney General and with the written consent of the Governor obtained in advance to be paid only out of funds arising from the receipts of the board when appropriated for this purpose by law."

Both the Attorney General and the Governor authorized this suit to be instituted in the name of the Commonwealth at the relation of the Virginia State Board of Examiners in Optometry, the purpose being to enforce the police power of the Commonwealth for the protection of the public health and for the advancement of the general welfare of the inhabitants. The fact that a state is a party plaintiff does not prevent the case from being removable to the proper Federal court, but when a state is a party plaintiff no question of diversity of citizenship exists, "for a state, in the nature of things, cannot be a citizen of any state." Hughes' Federal Practice, sec. 2321, p. 96.

Respondents rely on the *State of Ohio* v. *Swift & Co.*, 270 F. 141, to sustain their contention that this cause is removable on the ground of diversity of citizenship. The pertinent facts in that case were that Allen J. Seney, a prosecuting attorney of Lucas County, alleged that he was a duly elected and qualified prosecuting attorney, and that he brought the action in his official capacity on behalf of the State of Ohio. The prosecuting attorney referred to no statute, nor to any general law, which authorized him to implead the state. The court stated that the "solution of the question as to who should, for the purpose of removal, be considered as the plaintiff, is full of complication and difficulty. * * * ' The complaint is signed, 'Allen J. Seney, Prosecuting Attorney of Lucas County, Ohio,' and is verified by 'Allen J. Seney.' He does not allege that any law authorizes him to cause the state to sue or to be sued. The consent of the state to be a party is essential, and it can be given only by those authorized. Ordinarily, the state sues by the Attorney General, and even he should point out his authority to implead the state."

█■█ The facts in the case at bar are distinguishable. First, Code, sec. 1637, authorizes the Virginia State Board of Examiners in Optometry to employ counsel to assist in the enforcement of the statutes involved. The Governor and the Attorney General are the proper officials to implead the Commonwealth of Virginia. The bill is signed by the Commonwealth of Virginia at the relation of the members of the Virginia State Board of Examiners in Optometry and by the Attorney General. These facts and the dominating purpose of the suit are sufficient to support the conclusion that the Commonwealth of Virginia is the real party plaintiff.

 The second assignment of error challenges the jurisdiction of the court to issue an injunction on the ground that equity will not restrain an act merely because it is a violation of a criminal statute. *Drummond* v. *Rowe*, 155 Va. 725, 156 S. E. 442; *Turner* v. *Hicks*, 164 Va. 612, 180 S. E. 543, and *Mears* v. *Colonial Beach*, 166 Va. 278, 184 S. E. 175, are cited to support this contention. The principle is sound and has been applied in numerous cases. However, it is not the controlling principle applicable to the facts stated. The bill charges respondents with the illegal practice of optometry, and with advertising the sale of eyeglasses at bargain prices, using fraudulent tricks and devices to entice the general public into their place of business for the purpose of unlawfully procuring large sums of money; states that the advertisements in the newspapers of Richmond and five other cities of the Commonwealth were part and parcel of a general plan and scheme to disseminate false and misleading advertisements throughout the Commonwealth; and avers that the business so conducted constitutes a menace to the health and welfare of the public at large. It is further alleged that the fines and punishments imposed by the statute would necessitate a multiplicity of prosecutions in numerous counties and cities and would not afford an adequate remedy at law for the protection of the public generally, and that the respondents had attempted to prevent the institution of criminal prosecutions against them by

threats of retaliation in the form of damage suits. These and other allegations, if established by evidence, are sufficient to constitute a nuisance *per se*. Any act, omission or use of property which is of itself hurtful to health, tranquillity or morals, or outrages the decency of the community is a nuisance.

In the famous *Debs Case*, 158 U. S. 564, at page 584, 15 S. Ct. 900, 39 L. Ed. 1092, it is said: "Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court."

In 28 Am. Jur., p. 341, this is said: "The state is intrusted with the duty of protecting the public against criminal acts injurious to the civil or property rights or privileges of the public or the public health. Ordinarily recourse is had to its criminal courts for such purpose. Yet there may be cases where the remedy at law by criminal prosecution and punishment would not be adequate under the circumstances, and where the remedy in equity by injunction would furnish more effectual and complete relief. In such cases, according to the weight of authority, when the interests of the state or other political division or the interests of those entitled to its protection are thus affected by criminal acts or practices, the state, acting through its governmental agencies, may invoke the jurisdiction of equity to have them restrained."

While the agents and employees of respondents may be amenable to criminal prosecution for the acts alleged, the principal offenders are respondents who are nonresidents, hence the Commonwealth might have serious difficulty in en-

forcing a judgment of conviction, if obtained, as misdemeanors are not extraditable offenses. The allegation and proof reveal that the ordinary recourse to criminal prosecution would not be adequate for the protection of the public health and welfare and, under the principles stated, equity has jurisdiction to issue the injunction sought.

The third assignment of error is based on the trial court's ruling that the respondents were engaged in the practice of optometry in violation of law.

The Legislature has declared optometry to be a profession and has defined the practice of optometry (Code, sec. 1624) as follows: "Optometry is hereby declared to be a profession. Any person shall be deemed to be practicing optometry within the meaning of this chapter who shall display a sign, such as an eye, a pair of eyes, or who shall in any way advertise himself as an optometrist, or who shall examine the human eye, to ascertain the presence of defects or abnormal conditions which can be corrected or relieved or the effects of which may be corrected or relieved by the use of lenses, prisms, or ocular exercises, or employ any subjective or objective mechanical means to determine the accommodative or refractive states of the human eye or range or power of vision of the human eye, or have in his possession testing appliances for the purpose of the measurement of the powers of vision, or diagnose any ocular refractive deficiency or deformity, visual or muscular anomaly of the human eye, or prescribe or adapt lenses, prisms, or ocular exercises for the correction or relief of the same, or who holds himself out as being able to do so, or who shall use the title of doctor of optometry (O. D.), or any other letters or title in connection with his or her name, which in any way may convey the impression that he or she is engaged in the practice of optometry."

The causes for which a certificate to practice optometry may be revoked are defined in Code, sec. 1635, and the prohibitions and penalties for the violation thereof are

stated in Code, secs. 1636 and 1637. For convenience, these sections are quoted in full in a footnote.*

Most of the testimony was taken *ore tenus* and, to some extent, was in conflict. Applying familiar principles, this court will ignore the conflicts and summarize the evidence from the Commonwealth's point of view.

Before respondents began business in the six cities in Virginia, they communicated with certain licensed physicians. Their first contact outlining the terms of the proposed employment is evidenced by the following written communication (with italics supplied) mailed to a physician:

"Dear Doctor:

"I would like to enter into an arrangement with you, *requiring your full time service away from your office.* If you are willing to leave town, we can offer you a definite GUARANTEE of $50.00 PER WEEK, with an opportunity to make as high as $100.00 per week, refracting

---

*Sec. 1635. "For what cause certificate to be revoked; how new certificate obtained.—The said board shall revoke or suspend a certificate of registration or exemption or censure the holder of such certificate for any of the following causes:

"1.—(a) If the holder thereof is in default in the payment of his yearly license for more than thirty days after being notified of such default by registered letter sent to his last known place of address;

"(b) If person is guilty of fraud or deceit in his practice;

"(c) If such person has been convicted of a felony or other crime involving moral turpitude;

"(d) If such person is an habitual drunkard or is incompetent to practice optometry;

"(e) If such person has been guilty of fraud or deceit in the answering of any question required to be answered as to his qualification for the purpose of being admitted to examination or in the procuring of a certificate to practice optometry;

"(f) If such person employs an unlicensed person to do anything for which a certificate to practice optometry is required;

"(g) If such person practices optometry while suffering from any infectious or contagious disease;

"(h) If such person neglects or refuses to display his certificate and the renewal receipt for the same for the current year, as required by section sixteen hundred and thirty-four of the Code for more than thirty days after being required to do so by written notice given him by any member of the Virginia State Board of Examiners in Optometry.

patients *that are recommended to you.* Office space is provided. *This is a permanent arrangement.* The proposition is in Virginia. No experience required.

"If you are interested, phone or wire at once,

"L. MACHLAN

"205—27th St. Newport News, Va."

If the doctor was willing to accept the conditions stated, respondents employed him, guaranteed him a net income of from $50 to $100 a week, and furnished him office space in their store, telephone service and receptionist.

After these arrangements were completed and the doctor installed, respondents engaged in an advertising campaign to attract customers by the distribution of circulars from house to house and by publications in daily newspapers, of which the following is a fair sample:

"(i) If such person refuses or neglects to issue the bill of purchase required in section sixteen hundred and thirty-four of the Code when practicing outside of or away from his office.

"(j) If such person engages in the house to house soliciting for the purpose of fitting or selling or peddling spectacles, eyeglasses or lenses.

"2. The following acts shall be deemed as unprofessional conduct on the part of a holder of a certificate of registration to practice optometry:

"(a) The obtaining of any fee by fraud or misrepresentation of the practice of deception or fraud upon any patient;

"(b) The employment of any person to solicit from house to house the sale of eye-glasses, spectacles, lenses, frames, mountings or optometric services or examinations;

"(c) The conducting or employment of any person to conduct a house to house canvass for the purpose of selling, advertising or soliciting the sale of spectacles, eye-glasses, lenses, frames, mountings or optometric services or examinations;

"(d). The advertising directly or indirectly the following: Statements as to skill or method of practice of any person or of any optometrist; in any manner that will tend to deceive, mislead or defraud the public; to claim professional superiority; to offer free optometrical services or examinations; to set forth any amount, price, premium, gift, discount or terms for professional services or for eye-glasses, spectacles, lenses, frames, mountings or any other prosthetic devices;

"(e) The employment, hiring, procuring, or inducing a person not licensed to practice optometry to so practice;

"(f) The aiding or abetting in the practice of optometry any person not duly licensed to practice in this State;

"(g) The advertising, practicing or attempting to practice optometry

*Exhibit Rice #1 J.S.*

# BIFOCAL SALE!

## THIS WEEK

## SENSATIONAL OFFER!

**Double Vision Bifocal Glasses for Near and Far Vision — Seamless, One-Piece, Invisible. The buy of the year. Don't fail to take advantage of this amazing bargain.**

**BIFOCAL DOUBLE VISION GLASSES.................** ~~$12.80~~ Value **$388**

We offer this opportunity to our fellow townsmen and neighbors to get Double Vision Bifocal glasses (for *far and near vision* in the same pair of glasses); at the low price of only $3.88. These beautiful rimless glasses are complete with Toric stock Bifocal lenses and engraved Rhodium finish mounting. Take advantage of this unusual offering to get the glasses you need at prices you can afford.

### Largest Opticians in America

We have the largest chain of optical parlors in the country. Our numerous branches in many of the principal cities of the country offer better glasses at lower prices to people everywhere. Our volume purchasing power makes it possible for our prices to be so low. However, only the price is low—there is no sacrifice of service or quality.

### Millions Satisfied

The principals of this firm have been in the optical business for more than a third of a century. They have supplied glasses to millions of men, women and children. They can satisfy you too. All glasses sold by us are ground by expert optical artisans on prescriptions of licensed Doctors.

### Easy Payments — No Extra Cost

Don't neglect getting needed glasses because of shortage of ready cash. Use our credit plan. No co-signers, no interest, no carrying charges. No extra cost of any kind. Pay a little down, a little per week. Make your own terms.

**CREDIT IF DESIRED NO EXTRA CHARGE**

### REPAIRS
Broken lenses duplicated, frames repaired — replaced. Oculists' prescriptions filled. Lowest factory prices.

# FREE!

Your glasses straightened, and adjusted without charge, regardless of where you purchased them.

### IRON CLAD MONEY BACK GUARANTEE

We guarantee to please you in every way. You must be satisfied, and you are the sole judge—or your money will be refunded.

## NATIONAL OPTICAL STORES CO
### ·LARGEST OPTICIANS IN AMERICA·

## 827 Main Street, LYNCHBURG, VA.
### OPEN SATURDAY TILL 9:00 P.M.
### Stores in Many Principal Cities of the United States
**OVER 3,000,000 CUSTOMERS** **Special Rates to Service Men**
*No 10% Federal Tax on Glasses*

A person who was induced by these advertisements to visit respondents' store was directed to the doctor, who examined his eyes within fifteen minutes, wrote a prescription, collected a fee of $2, and personally delivered the prescription either to an employee of respondents in the store or to the customer with the direction that it be given an employee salesman. Thereupon the customer was told that the condition of his eyes was so serious that only an expensive type of lens would meet his requirements, the cheap eyeglasses which had been advertised were "knocked" and disparaged, and the customer was advised against the purchase of them. In the vast majority of cases the customer purchased glasses, paying therefor from $15.00 to $22.50 and sometimes more. Frequently the customer made a partial cash payment and weekly payments thereafter.

The physician himself at times participated in the sales talk whereby the customer was induced to make his purchase.

---

under a name other than one's own name as set forth on the certificate of registration;

"(h) The lending, leasing, renting or in any other manner placing his certificate of registration at the disposal or in the service of any person not licensed to practice optometry in this State;

"(i) The splitting or dividing of a fee with any person or persons other than with a duly registered optometrist who is a legal partner.

"(j) But nothing contained in this statute shall prohibit any registered optometrist from practicing optometry as a full time employee on the premises of any commercial or mercantile establishment and from advertising, either himself or through such commercial or mercantile establishment, that he is a duly registered optometrist and offering to practice optometry as an employee of such commercial or mercantile establishment.

"(k) No registered optometrist shall practice optometry as an employee, directly or indirectly, of any commercial or mercantile establishment nor shall he so advertise himself or through such commercial or mercantile establishment, unless such commercial or mercantile establishment is employing a full-time registered optometrist in its established place of business when this act becomes effective.

"3. The continuance of an optometrist directly or indirectly in the employ of or in association with any optometrist, after he has knowledge that such optometrist is engaged in violation of the provisions of this act.

"But no certificate shall be revoked until the holder is given a hearing before the said board after ten days written notice of the time and place of such hearing, served by the secretary of the board by registered mail, sent to the last known address of such person. A person who shall practice

In many cases the glasses were unsuited to the customer's requirements and were unsatisfactory, but, when adjustments were sought, the customer was told, either by the physician or by one of respondents' other employees, that he must wear the glasses until he became "used" to them. Cash refunds were refused upon one pretext or another until the customer became "worn down and gave up without redress."

Respondents' construction and interpretation of their testimony may be summarized as follows: Their business is filling prescriptions of physicians and optometrists licensed to practice in Virginia, and making up eyeglasses, frames, mountings and lenses pursuant to the prescription of such persons. Customers present the prescriptions to employees of respondents at their local stores. Prescriptions are sent to Chicago for manufacture of lenses and frames. The completed articles are returned to the proper local store and delivered to the customers. Respondents also contend that their firm neither employs nor splits fees with physicians or

optometry after the revocation of his certificate shall be deemed to have practiced without a certificate. A person whose certificate has been revoked may, after the expiration of one year from the date of such revocation, apply for a new certificate in the manner provided for original application, and the board may in its discretion exempt the applicant from examination and grant him a certificate.

"Any person whose certificate has been revoked shall have the right of appeal to the Circuit Court of the City of Richmond, either in term time or vacation and a trial de novo. Such appeal shall be taken within thirty days from receipt of the notice of revocation."

Sec. 1636. "Prohibited acts.—No person not a holder of a certificate duly issued to him and filed as provided, shall practice optometry in this State. No person shall falsely personate a registered optometrist of a like or different name, nor buy, or sell, or fraudulently obtain a certificate issued to another.

"Practicing or offering to practice optometry, or the public representation of being qualified to practice the same by any person not authorized to practice optometry, shall be sufficient evidence of a violation of the law."

Sec. 1637. "Prohibitions and penalties.—It shall be unlawful for any person:

"(a) To practice optometry in this State without being the holder of either a certificate of registration or certificate of exemption duly issued to him and filed as provided.

"(b) To falsely impersonate a registered optometrist of like or different name.

optometrists. It will accept and fill prescriptions of any qualified and licensed physician or optometrist. Respondents neither exercise nor attempt to exercise any supervision or control over the method or means of these physicians in examining eyes, nor do they attempt in any way to influence the physicians in the preparation of prescriptions. The physicians in the respondents' respective stores are not restricted in their practice to prospective customers of respondents. They are independent contractors.

█ B. D. Ritholz, one of the respondents, testified that he was the operating partner of the firm, that respondents operated 89 stores in various states and Canada, and that their method of conducting business was the same in all the stores. Similar arrangements or agreements with licensed physicians or licensed optometrists have been held to constitute the physicians or the optometrists employees of respondents and not independent contractors, as respondents claim. See *Ritholz* v. *Johnson,* 246 Wis. 442, 17 N. W. (2d) 590; *National Optical Stores* v. *Bryant,* 181 Tenn. (17

"(c) To buy or sell or fraudulently obtain a diploma, certificate of registration or certificate of exemption issued to another.

"(d) To do any act for which if he were an optometrist his certificate of registration or exemption may be revoked as provided by section sixteen hundred and thirty-five of the Code as amended.

"(e) To solicit from house to house, place to place, or on the highways or byways the fitting, selling or peddling of spectacles, eye-glasses or lenses.

"(f) To use, employ or cause to be used or employed any false, misleading or trick advertisement or sign or any advertisement or sign which would tend to deceive or mislead the public concerning any matter relating to the practice of optometry or the furnishing, supplying or dispensing of any article used or employed in connection with the practice of optometry whether such advertisement be printed, radio, display or by any other means.

"(g) To have possession of any trial lenses, trial frames, graduated test cards, appliances or instruments used in the practice of optometry, self-testing devices or eye-glass vending machines for the purpose of fitting or prescribing glasses in the practice of optometry, unless he be the holder of or unless he regularly employs on the premises the holder of, a certificate of registration or exemption to practice optometry or a duly licensed physician.

"(h) To give or offer to give either in person or by or through employees, solicitors or agents any eye-glasses, spectacles or lenses, either

Beeler) 266, 181 S. W. (2d) 139; *State* v. *Superior Court*, 17 Wash. (2d) 323, 135 P. (2d) 839; *Kay Jewelry Co.* v. *Board of Registration*, 305 Mass. 581, 27 N. E. (2d) 1.

In *McMurdo* v. *Getter*, 298 Mass. 363, 10 N. E. (2d) 139, 140, this is said: "A customer who desires eyeglasses is taken to the physician, who examines the eyes and prescribes eyeglasses if needed. Other employees of the defendants assist the customer in selecting the shape and style of frames desired, grind and fit the lenses in accordance with the prescription of the physician, and then adjust the finished eyeglasses to the eyes of the customer. We conclude that the physician is the servant of the defendants (*Stuart* v. *Sargent*, 283 Mass. 536, 541, 186 N. E. 649), notwithstanding the fact that the defendants actually exercise no control over 'the mode, manner or result of the examination of the eyes of the customer and the doctor is left free to exercise his own will (and) judgment and to use his own professional

with or without frames or mountings, as a premium, gift or inducement for the purchase of any goods, wares or merchandise.

"(i) To advertise by print, radio, display or by any other means whatsoever any advertisement which quotes prices of eye-glasses, spectacles, lenses, frames or mountings or which quotes a discount, gift or terms of credit or payment for professional services or prosthetic devices, spectacles, eye-glasses, lenses, frames or mountings to be furnished to the public or which quotes 'Moderate prices', 'low prices', 'lowest prices', 'guaranteed glasses', 'satisfaction guaranteed', or any words of similar import, or which includes in said advertisement the words 'eye examination free', 'consultation free', 'free eye-sight test', 'free sight test', or any words of similar import.

"(j) To sell, provide, furnish, supply or duplicate spectacles, eye-glasses, or lenses for the correction of vision, except upon the prescription of a duly licensed physician or duly registered optometrist, unless he is the holder of a certificate of registration or exemption to practice optometry or a license to practice medicine under the laws of this State.

"Any violations of any provisions of sections sixteen hundred and twenty-four to sixteen hundred and thirty-seven, both inclusive, of this Code shall be a misdemeanor and the penalty therefor shall be a fine of not less than twenty-five dollars nor more than five hundred dollars, or imprisonment for not less than thirty days, nor more than six months, or both. It shall be the duty of the respective Commonwealth's attorneys to prosecute all cases arising under this section, but the board may employ additional counsel from time to time when necessary upon recommendation of the Attorney General and with the written consent of the Governor obtained in advance to be paid only out of funds arising from the receipts of the board when appropriated for this purpose by law."

skill and methods in making such examination.' *McDermott's Case*, 283 Mass. 74, 77, 186 N. E. 231; *Deyette v. Boston Elevated R. Co.*, 297 Mass. 129, 7 N. E. (2d) 430."

In the Massachusetts case, the optometrist was paid a salary. The customers did not pay a separate fee to the optometrist as his compensation was included in the prices of the eyeglasses sold. The relationship of the parties is not changed by the different methods of payment. It follows that the respondents in this case are practicing optometry within the definition of the statute.

Respondents contend that, under the exemption (sec. 1638), they have a right to sell spectacles and eyeglasses as articles of merchandise from a regularly located and established place of business.

It is quite true that the statutes do not prohibit the sale of eyeglasses or spectacles, or any such articles, as merchandise from a regularly located and established place of business. Respondents' trouble is that their advertisements, their method of conducting business and their confession establish the fact that they are not selling the articles enumerated as merchandise. The following excerpts, with italics supplied, are taken from two of their advertisements:

## "SENSATIONAL OFFER!

*"Double Vision Bifocal Glasses for Near and Far Vision* * * * . The buy of the year. Don't fail to take advantage of this amazing bargain.

"BIFOCAL DOUBLE

$12.00 Value

VISION GLASSES........................$3.88

" * * * Take advantage of this unusual offering to get the glasses you need at prices you can afford.
" * * * *All glasses sold by us are ground by expert optical artisans on prescriptions of licensed Doctors.*

"* * *

## "IRON CLAD MONEY BACK GUARANTEE

*"We guarantee to please you in every way. You must be satisfied,* and you are the sole judge—or your money will be refunded."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Why You Should Buy Glasses at NATIONAL
" * * * All glasses ground on prescription of licensed doctor.

"* * *

"A 15-day home trial will quickly convince you how these fine glasses will improve your appearance, enable you to see far or near."

A number of witnesses introduced by the Commonwealth testified that, when they entered respondents' store in response to the advertisements, they were informed that no glasses would be sold them except on the prescription of an optometrist or a physician. Dr. Turner, an optometrist, testified: "On January 15, 1942, I went to the National Optical Stores Company located on Broad Street in Richmond for the purpose of having my eyes examined. As I walked in the door of the establishment three men were standing by the window talking. One man detached himself from the group and walked over and asked me what I wanted and I explained my purpose to obtain some glasses. This gentleman said, 'Come with me'. We entered a small room off of that reception room and in this room was a trial case, a paper test chart, an ordinary chair and the trial frame for use on the nose in using the lenses from the case. No preliminary examination was made of my eyes, my history, my background as far as health was concerned; no internal examination of the eyes was made to ascertain whether there was any diseased condition or not. A very short subjective examination was made. By subjective I mean the patient was asked all of the questions; no instru-

ments were used, and that ended it. The doctor collected a fee from me of $2.00.

\* \* \* \* \* \* \*

"The gentleman took me into the main reception room again and into another little room walled off from that reception room and introduced me to a gentleman by the name of Mr. Williams and said Mr. Williams would fit my glasses for me. Mr. Williams told me that my eyes were in a very bad condition, that the prescription was very complicated, that the lenses as written on the prescription would ordinarily not be ground by a regular optician and it would take at least twelve hours in grinding those lenses because if they were ground too rapidly they would crystallize and break. I inquired from Mr. Williams as to the cost of the glasses and he showed me several pair. The cheapest pair was $16.50. Then I inquired as to the advertisement in the paper of glasses at $3.49 and he informed me he was very sorry, but the type of lens I required it was impossible to obtain glasses at that cost and that my glasses the cheapest thing he could give me would cost me $16.50. I concluded by paying $22.50 for the glasses * * * ." This witness also stated that the lenses were not suitable to his eyes and would have injured his health if he had worn them continuously for any length of time.

In a prosecution (Docket No. 3143) before the Federal Trade Commission, respondents, doing business as the National Optical Stores Company, were charged with using unfair methods of competition in commerce contrary to the Federal statute. The advertisements referred to were similar to those in the instant case. On October 16, 1939, in an amended answer filed before the Federal Trade Commission, this is said: "Respondents deny that they are engaged in commerce or trade of any kind, intra-state, or inter-state, but state the fact to be that they are engaged in the practice of the profession of optometry, and are not therefore amenable to the provisions of the Federal Trade Commission Act, Approved September 26, 1914. * * * Respond-

ents therefore deny that the Federal Trade Commission has any jurisdiction over the practice of the profession of optometry, in which respondents are engaged."

Officers of Better Business Bureaus of Chicago, Detroit, Baltimore, Richmond, Roanoke and Indianapolis testified that the reputation of Benjamin D. Ritholz for truth, veracity and fair business practice is bad in each of the cities named. Officers in charge of enforcing penalties for violation of fair employment practices, under Act of Congress approved September 26, 1914, testified that more than 5,000 complainants against respondents for their method of conducting business similar to the method of conducting business now under consideration has been investigated and that respondents acknowledged 1,262 such complaints to be meritorious (Most of these have been settled.), and that post office fraud orders had been issued against respondents which barred them from doing a similar business by mail.

Respondents and the physicians employed by them have entered into an agreement or scheme that may appear innocent but in practice operates as a fraud on the public in direct violation of the provisions of the statutes. Both the respondents and the employed physician share in the spoils received from these violations of law.

A similar contention was made by the same respondents in the State of Arkansas. The Supreme Court of that State, in *Ritholz* v. *Arkansas State Board of Optometry*, 206 Ark. 671, 177 S. W. (2d) 410, 411-12, stated: "Ritholz and his associates represent themselves to be operators of the largest chain of optical stores in America. Their principal place of business is in Chicago. Prior to July, 1940, they had employed a physician whose compensation was $40 per week. None in the Ritholz partnership was a physician, optometrist, ophthalmologist, or in other respects professionally equipped. National maintains a Little Rock store at 207 Main Street and claims that its business is merchandising; that in effect it sells glasses the way a druggist fills prescriptions for medicine. In addition, it carries in stock an assortment of

ready-made spectacles, and permits customers to fit them-selves. This phase of the business is not complained of and is not within the judicial (legislative) inhibition.

"An excerpt from one of appellants' newspaper advertise-ments is: 'All glasses sold by us are ground by expert optical artisans in our modern laboratory on prescription of a licensed doctor.' This is inconsistent with the claim that National engaged exclusively in merchandising. Other misrepresentations were shown which do not come within the rule permitting legitimate 'puffing.' "

The identical advertisement used by these same respond-ents was before the court in *Ritholz* v. *Johnson*, 246 Wis. 442, 17 N. W. (2d) 590. The Wisconsin court, in com-menting thereon, said: "A plain bare fraud is thus worked. * * * . The aim and practice of the plaintiffs, as shown by the testimony of the plaintiffs' sales manager and the 'Man-ual of Instruction' to their salesmen, is to sell the customer the highest priced glasses and frames possible to foist upon him even though the complete glasses advertised at the price of $3.45 or $2.87 as the case may be would supply his need as well. This in case of a customer who is wealthy or well to do may be mere good salesmanship, but it is against the public welfare when it is done to the poor or class of cus-tomers whom the plaintiffs mostly serve who generally need all the money they have for the bare necessities of life. And so as to filching a dollar for the examination from the class of customers with whom the plaintiffs mostly deal."

The advertising of the sale of glasses with optometri-cal service at a price certain is apt to be used as a lure and bait to the unwary and as a means of deception of those who are attracted by a seemingly low price without con-sidering the degree of skill involved. It tends to promote unfair competition against those skilled in the profession. The 'barker' and others who make their livelihood out of human gullibility cannot apply their talents to human eye-sight without serious consequences. The Legislature un-doubtedly had these evils in mind when it adopted the Optometrical Act in its present form. Reasonable statutory

regulation of advertising involving professional services is proper where, in the absence of such legislation, great evils will follow. *Laughney* v. *Maybury*, 145 Wash. 146, 259 P. 17, 54 A. L. R. 393, and notes.

The following excerpt is taken from *Commonwealth* v. *Ferris*, 305 Mass. 233, 25 N. E. (2d) 378: "A familiar ground of the regulation or restriction of contracts or of advertising in a commercial business is the prevention of fraud and mistake. Where the public are not cautious or watchful in their buying habits and are likely to be misled, the Legislature may require not only the absence of active deception (*Commonwealth* v. *Reilly*, 248 Mass. 1, 142 N. E. 915), but also affirmative measures to prevent misunderstanding. Of this, reported cases furnish many illustrations." See *State Board of Optometry* v. *Gilmore*, 147 Fla. 776, 3 So. (2d) 708.

While the allegations of the bill and the proof clearly show that the respondents have not brought themselves within the exemption stated in the last part of Code, sec. 1638, the prayer of the bill for a construction of the statute and a declaratory judgment, and the contentions of respondents raise the issue as to whether a party, who is expressly permitted to sell spectacles and eyeglasses as merchandise, may be enjoined from advertising "by print, radio, display or by any other means whatsoever any advertisement which quotes prices of eyeglasses, spectacles," etc., as set forth in Code, sec. 1637, (i). Indeed, the trial court restrained and enjoined respondents "from publishing, advertising, or otherwise publicly proclaiming or publicly stating through newspapers or otherwise, by words, figures or combinations thereof, any language quoting prices of eye-glasses; (b) From publishing or circulating, or causing to be published or circulated, any misleading statement, advertisement or other public notice calculated to mislead the public or any individual with reference to the quotation of prices of eye-glasses."

The foregoing part of the trial court's decree is attacked on the ground that the provision of section 1637, "it shall

be unlawful for *any person*" to do any of the acts prohibited therein and especially the prohibition of subsection (i) as applied to the sale of eyeglasses and spectacles as merchandise in a regularly located and established place of business, is broader than the title to the act and hence is void because contrary to Article IV, sec. 52, of the Constitution of Virginia.

The act defining the regulation and practice of optometry, etc., was adopted in 1916 (Acts 1916, pp. 251-254). Section 16 of that act provided: "That nothing in this act shall be construed to apply to duly licensed physicians, authorized to practice medicine under the laws of the State of Virginia, nor to persons who sell spectacles, eyeglasses, or lenses, either on prescriptions from physicians or duly qualified optometrists, or as merchandise from a permanently located and established place of business." This act was codified by the Code revisors of the 1919 Code in chapter 68, regulating the practice of medicine. The penalties prescribed and the parties excluded from the act were codified as Code, secs. 1637 and 1638. These sections were again amended in 1938 (Acts 1938, p. 995.) The titles to the respective amendatory acts simply referred to the appropriate sections by number, as is the usual legislative practice. The act in force at the time the suit was instituted was an amendment adopted in 1940 (Acts 1940, p. 22), the title to which reads: "An ACT to amend and re-enact Section 1638 of the Code of Virginia, as heretofore amended, relating to optometry and to the practice of optometry." The pertinent part of the amendment is as follows: " * * * nor shall anything in section sixteen hundred and thirty-seven subsection j be construed to prohibit the sale of spectacles, and eye-glasses, or any of such articles, as merchandise from a regularly located and established place of business."

A new subsection 2 was added, which reads: "If any provision of this act, or the application thereof to any person or circumstances, is held invalid, the remainder of this act and the application of such provision to other persons or circumstances shall not be affected thereby."

The same question was raised in *Commonwealth* v. *Brown*, 91 Va. 762, 775, 21 S. E. 357, 28 L. R. A. 110, where this was said: "They (the laws contained in the Code of 1887) were collated, revised and digested under appropriate titles and chapters, and divided into sections in pursuance of an act of the legislature, and then passed by it as one act under a proper title with the object of the act therein duly expressed: "An act to revise, arrange, and consolidate into a Code the general statutes of the Commonwealth, approved May 16, 1887,' in strict compliance with the Constitution.

"It was not to amendments of general statutes thus consolidated into a Code that Section 15 of Article V (now sec. 52 of Article IV) of the Constitution was intended to apply, but it was aimed at the separate acts in their original enactment, when the opportunity existed for the evils and the mischief to be done, which the constitutional provision was designed to prevent or defeat. It is not necessary, therefore, to do more, if so much, in amending and re-enacting or repealing any part of the Code or adding thereto, than refer to the proper chapter and section thereof to be amended or repealed or added to, and adopt and express in the title of the amendatory act the number and subject of such chapter, if the provision of such amendment by re-enactment or by additional section or sections is germane to the subject of the chapter."

Judge Whittle, speaking for the court on the same question in *Bertram* v. *Commonwealth*, 108 Va. 902, 904, 62 S. E. 969, said: "But whatever merit these assignments may have possessed with respect to the original act need not now be considered, since its provisions have been substantially incorporated in the Code of 1887, * * * . The Code constitutes but one act, and the practical effect of sustaining the contention of the plaintiff in error would be to strike down the entire fabric."

"The sufficiency of such title is demonstrated in the able discussion of the subject by Riley, J., in the *Iverson Brown Case*, [91 Va. 762, 21 S. E. 357, 28 L. R. A. 110], a reference to which on that point should suffice. That case also holds that, 'when an act of assembly

has been incorporated in the Code, this act may be amended, re-enacted or repealed by an act which simply refers to the number of its section.' " *Tresnon* v. *Board of Supervisors*, 120 Va. 203, 206-7, 90 S. E. 615.

Mr. Justice Campbell, now Chief Justice, in *Good* v. *Commonwealth*, 155 Va. 996, 1000, 154 S. E. 477, said: "It is to be observed that we are not called upon to construe an independent act of the General Assembly, but a section of the Code. The rule of construction is not the same. In determining whether an independent act is obnoxious to the Constitution we must look to the title, as well as to the body of the act, to ascertain if more than one object is embraced in its provisions. In construing a section of the Code we are not concerned with the heading of the section, as it is purely a matter of informative convenience and in no sense a part of the provisions of the section. If the section construed is germane to the title of the chapter of the Code dealing with the subject, that sufficeth, as the Code is one act and is to be construed as a whole."

See *District Road Board* v. *Spilman*, 117 Va. 201, 84 S. E. 103; *Commonwealth* v. *Chesapeake, etc., Ry. Co.*, 118 Va. 261, 87 S. E. 622; *Southern Ry. Co.* v. *Russell*, 133 Va. 292, 112 S. E. 700; 50 Am. Jur., pp. 186-7.

Respondents further contend that a statute prohibiting a party who is expressly authorized to sell spectacles and eyeglasses from advertising the prices is invalid because it violates the Bill of Rights, sec. 1, and the due process clause, sec. 11, of the Constitution of Virginia. In other words, the contention is that this specific regulation as to quoting prices is so arbitrary and unreasonable that it unduly interferes with respondents' right to conduct a business expressly authorized by statute.

On this question the courts are divided. Some hold that provisions prohibiting such advertisements quoting prices are arbitrary and an unreasonable restraint of a lawful business. See *Regal Oil Co.* v. *State*, 123 N. J. L. 456, 10 A. (2d) 495; *Golding* v. *Schubach Optical Co.*, 93 Utah

32, 70 P. (2d) 871; *State* v. *Beck Jewelry Enterprises,* 220 Ind. 276, 41 N. E. (2d) 622, 141 A. L. R. 876, and see discussions in *Sage-Allen Co.* v. *Wheeler,* 119 Conn. 667, 179 A. 195, 98 A. L. R. 897 (reversed for the taking of additional evidence) and *State* v. *Goodman,* 206 Minn. 203, 288 N. W. 157.

The better reasoned cases hold that restrictions and regulations of the sale of eyeglasses are measures directed to the prevention of substantial harm to the public health and are within the exercise of the police power of the State.

In *Roschen* v. *Ward,* 279 U. S. 337, 49 S. Ct. 336, 73 L. Ed. 722, a statute was held constitutional which forbade the sale of eyeglasses or lenses unless a licensed physician or optometrist was in charge and in attendance at the place where they were sold. The constitutionality of the act was upheld on the ground that the State had an interest in seeing that the eyesight of its citizens would not be impaired by the use of eyeglasses or lenses unskillfully selected even by themselves. If the statute had prohibited the sale of eyeglasses and lenses as merchandise, such a provision would be upheld, for, as Mr. Justice Holmes said, "A statute is not invalid under the Constitution because it might have gone farther than it did, or because it may not succeed in bringing about the result that it tends to produce."

The following quotation is from Judge A. N. Hand's opinion in *Kresge Co.* v. *Ottinger,* 29 F. (2d) 762, 764: "To render an optometrist available wherever eyeglasses are sold is certainly a long step toward correcting existing evils. * * * It seems to us that the inevitable tendency would be for customers to consult him * * * . If the effect of the new requirement should finally be to render the sale of a standardized product unprofitable, so that the customers in the end would not purchase it, but would have their eyes carefully tested and their glasses made according to special prescriptions, it cannot be said that the result might not on the whole be desirable."

"The Legislature evidently was not prepared to prohibit the sale of eyeglasses and lenses as merchandise, to be selected

by the buyer. But it was prepared to discourage it, by eliminating the temptation to and pressure upon customers that result from the assurance that no more than a named price will be charged, or that the price is less than competitors ask. As in *Roschen* v. *Ward, supra,* that shorter step is consistent with the Constitution. It is not unlike the prohibition of the sale of drugs or medicinal compounds by itinerant vendors, sustained in *Baccus* v. *Louisiana,* 232 U. S. 334, 34 S. Ct. 439, 58 L. Ed. 627." *Commonwealth* v. *Ferris, supra.*

We cannot say that this particular legislative policy of regulating and restricting the advertisement of prices and the sale of spectacles and eyeglasses as merchandise is so arbitrary or unreasonable as to contravene the proper exercise of the police power of the Commonwealth.

The substance of respondents' contention that the optometry statutes violate the provisions of the Federal Constitution is based upon their conclusion that such statutes are class legislation.

Mr. Chief Justice Hughes, in *Semler* v. *Oregon State Board of Dental Examiners,* 294 U. S. 608, 612, 55 S. Ct. 570, 79 L. Ed. 1086, addressing his remarks to the constitutionality of statutes regulating the practice of dentistry, used this language: "We do not doubt the authority of the State to estimate the baleful effects of such methods and to put a stop to them. The legislature was not dealing with traders in commodities, but with the vital interest of public health * * * ." Furnishing glasses affects the public health as much as furnishing artificial teeth. See *Ritholz* v. *Johnson, supra; Ritholz* v. *Arkansas State Board of Optometry,* 206 Ark. 671, 177 S. W. (2d) 410, 411; *Commonwealth* v. *Ferris, supra.*

Substantially every argument of respondents against the constitutionality of the statutes here involved was urged upon, and rejected by, this court in *Goe* v. *Gifford,* 168 Va. 497, 191 S. E. 783, which involved the constitutionality of statutes regulating the practice of dentistry. Any further discussion would be necessarily a repetition of Mr. Justice Eggleston's statements in that case.

The other assignments of error, not necessarily included

in the foregoing discussion, deal with the admission and consideration of evidence over respondents' objection. None of the exceptions upon which these assignments of error are based is well taken or is of sufficient importance to merit discussion.

The decree of the trial court is affirmed.

*Affirmed.*