Irving M. SMALL, O.D.

v.

**MAINE BOARD OF REGISTRATION AND EXAMINATION IN OPTOMETRY.**

Supreme Judicial Court of Maine.

July 26, 1972.

Preti & Flaherty, by David M. Cohen, Portland, for plaintiff.

Twitchell, Gray & Linscott, by Garth K. Chandler, Bangor, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY and ARCHIBALD, JJ.

WEBBER, Justice.

On April 10, 1970 the Administrative Hearing Commissioner, after full hearing, suspended the license of appellant Small to practice optometry for a period of eleven months commencing May 1, 1970. His appeal to the Superior Court was denied but the suspension was stayed pending his appeal to this Court. The Commissioner made comprehensive findings of fact and stated fully his conclusions of law applicable thereto, as a result of which the issues to be resolved on appeal are clearly focused.

32 M.R.S.A., Sec. 2556 provides in part:

"The * * * Administrative Hearing Commissioner * * * may suspend or revoke any certificate of registration for any one or more of the following causes:

\*    \*    \*    \*    \*    \*

7. *Practicing under another name.* Practicing under a name other than that given in the certificate of registration; * * *."

On the basis of undisputed evidence, the Commissioner found that Dr. Small was the holder of a registration and license issued in his own name but that from the summer of 1967 until late spring in 1968 the appellant carried on the practice of optometry under the name of "Maine Optical." This was a statutory violation and justified the imposition of a statutory penalty.

32 M.R.S.A., Sec. 2502 empowers the State Board of Registration and Examination in Optometry to "make such rules and regulations, not inconsistent with law, as may be necessary to govern the practice of optometry, but no rule or requirement shall be made that is unreasonable or that contravenes any provision of this chapter." Sec. 2556(8) provides as an additional ground for imposing sanctions on an optometrist, "Willfully violating any of the rules and regulations of the board." The Commissioner very properly felt compelled to assume the constitutionality of the statutory authorization to promulgate rules and regulations. The Board has promulgated 24 "Rules of Practice." The Commissioner found violations of several of these Rules, unrelated to any statutory violation, and based his disciplinary action in part on those violations. Appellant Small challenges the constitutional validity of the rule making authority.

The governing principles in their broad sweep are well summarized in the text of 1 Am.Jur.2d 903, 913, Secs. 105 and 113 which may be in part paraphrased and in part quoted as follows:

From the constitutional prohibition of the delegation of legislative powers, two fundamental concepts emerge: "(1) the legislature may not confer a discretion as to what the law shall be but it may confer discretion in the execution or administration of the law; and (2) the legislature must declare a policy and fix a standard in enacting a statute conferring discretionary power upon an administrative agency, but the agency may be authorized to 'fill up the details' in promot-

ing the purposes of the legislation and carrying it into effect."

"In order to avoid an unlawful delegation of power, the legislative authority must declare the policy or purpose of the law and, as a general rule, must also fix the legal principles which are to control in given cases by setting up standards or guides to indicate the extent, and prescribe the limits, of the discretion which may be exercised under the statute or ordinance by the administrative agency. Otherwise, the law may be construed as vesting an uncontrolled discretion and held to violate the inhibition against delegation of legislative powers."

The determination as to what constitutes proper administrative implementation of legislative policy and what amounts to improper administrative legislation is by no means an easy task. The judicial dilemma was well stated in State v. Marana Plantations, Inc. (1953) 75 Ariz. 111, 252 P.2d 87, 89 in these terms:

"The line of demarcation between what is a legitimate granting of power for administrative regulation and an illegitimate delegation of legislative power is often quite dim. A clear guide for all situations is indeed difficult. * * * It may safely be said that a statute which gives unlimited regulatory power to a commission, board or agency with no prescribed restraints nor criterion nor guide to its action offends the Constitution as a delegation of legislative power. The board must be corralled in some reasonable degree and must not be permitted to range at large and determine for itself the conditions under which a law should exist and pass the law it thinks appropriate. To use the apt phraseology of the late Justice Cardozo in Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 852, 79 L.Ed. 1570, an administrative board cannot be 'a roving commission to inquire into evils and upon discovery correct them' and it must be 'canalized

within banks that keep it from overflowing.' It cannot be 'unconfined and vagrant'."

To the same effect, Bacus v. Lake County (1960) 138 Mont. 69, 354 P.2d 1056, 1061; Louisiana State Board of Embalmers v. Britton (1963) 244 La. 756, 154 So.2d 389; Automobile Club of Missouri v. City of St. Louis (1960–Mo.) 334 S.W.2d 355, 359; Chapel v. Commonwealth (1955) 197 Va. 406, 89 S.E.2d 337 ("Government by legislation" contrasted with "government by bureaucracy"); Robertson v. Schein (1947) 305 Ky. 528, 204 S.W.2d 954, 957.

We adopted and applied these very principles in Kovack v. Licensing Board, City of Waterville (1961) 157 Me. 411, 416, 173 A.2d 554; Waterville Hotel Corp. v. Bd. of Zoning Appeals (1968–Me.) 241 A.2d 50, 52; and Phillips Pet. Co. v. Zoning Bd. of Appeals (1970–Me.) 260 A.2d 434, 435.

In a number of states police power statutes designed to regulate and control certain professions and types of business have contained very comprehensive statements of policy and regulatory standards which clearly avoid any basis for the constitutional attack. See for example Ritholz v. Commonwealth (1945) 184 Va. 339, 35 S.E. 2d 210, 215 which footnotes the Virginia Code at some length. The Code declared optometry to be a profession, defined precisely what would constitute "unprofessional conduct" and set forth in detail the bases for revocation of license and other penalties.

In the instant case the provisions of 32 M.R.S.A., Secs. 2451 to 2556 inc. contained no statement of legislative policy and no limitations or standards governing the rule making power entrusted to the Board. Rules promulgated pursuant to an impermissible delegation of legislative power are invalid and no penalties can be enforced for their violation. Moreover, rules which purport to proscribe and impose sanctions for conduct not reached by any legislative prohibition constitute an improper assumption of legislative power by an administra-

tive agency. As was said in Modern System Dentists v. State Board (1934) 216 Wis. 190, 256 N.W. 922, 927, "It is considered that it is not within the province of the board to add to the restrictions imposed by statute." Specifically, the application of these principles bars any penalty for violation of any of the rules promulgated by the Board.[1]

■ The final issue for consideration relates to an alleged violation of 32 M.R.S.A., Sec. 2452. This section provides in pertinent part:

"No * * * registered optometrist * * * shall *associate himself in any way with any* person not a registered optometrist nor any copartnership, firm or *corporation* for the promotion of any commercial practice *for profit or division of profit, which enables any such* person, copartnership, firm or *corporation to engage, either directly or indirectly, in the practice of optometry* in this State. * * *" (Emphasis ours)

The apparent purpose of the statute is to prevent a person or entity, not possessed of the skill and training required of a registered optometrist, from practicing optometry. For reasons which are not readily apparent the Legislature chose an oblique approach by imposing penalties upon the registered optometrist who by his conduct helps to make it possible for such person or entity to engage in such improper practice. A statute so worded poses problems for the State in mustering required proof which would clearly not be presented by a statute which addressed the problem of unprofessional conduct directly. The instant case furnishes an excellent example of the evidentiary problem thus unnecessarily created. The State, attempting to impose statutory sanctions upon the registered optometrist, must show (1) an association with a person or entity for profit or division of profit, (2) the improper practice of optometry by such person or entity, and (3) the effect of the association as enabling such person or entity to engage in the improper practice.

■ The Commissioner could have found on the basis of probative evidence that the appellant was approached by one known to appellant as Charles McClintock in September, 1968; that McClintock proposed that appellant become the lessee of office space located at 600–A Congress Street and adjacent to premises occupied by Pearle Optical of Portland, Inc., a Maine corporation holding itself out as engaged in business as an optician; that McClintock orally guaranteed the appellant a minimum annual income of $15,000 from patient fees; that appellant and McClintock agreed that there would be mutual referrals of business as between Pearle Optical and appellant; that on October 1, 1968 appellant executed a written lease of said office space from Opticks, Inc. of Dallas, Texas, said lease having been executed on behalf of the lessor by "C. R. McClintick, V. President"; that the tenancy thereby created was from month to month and called for a rental of $100 per month which has neither been paid nor demanded; that appellant entered into occupancy on October 10, 1968; that certain office equipment was furnished and signs installed by someone other than appellant, but by whom is not shown; that many but not all of appellant's patients are referred to him by Pearle Optical; that appellant's procedure is to examine the patient, prepare a written prescription for glasses, present the prescription to the patient with a referral to Pearle Optical, instruct the patient to return when the prescription has been filled,

1. It may be noted that the Commissioner found a violation of Rule 22 purporting to limit the right to an auxiliary office. Sec. 2553 as amended contemplates the maintenance of more than one office by an optometrist to be licensed upon payment of the statutory fee. In this case the fee was tendered by appellant and arbitrarily rejected by the Board. The statute vests no discretion in the Board to determine whether or under what circumstances an optometrist may maintain more than one office.

and to give the patient a final examination with the prescribed glasses if and when the patient returns; that the purpose of the final examination is to verify the prescription and make sure the glasses fit properly; that the patient pays the appellant for the examination and his services as an optometrist (with no additional charge for the final verification) and pays the optician for the glasses; that appellant does not prescribe glasses for all patients; that appellant has performed no services for Pearle Optical on the latter's premises or elsewhere; that the actual ownership of the office premises is not shown; that the relationship between Opticks, Inc. and Pearle Optical, if any, is not shown; and that the precise relationship, if any, of C. R. McClintock (or C. R. McClintick) to Pearle Optical is not shown.[2]

The Commissioner found at the outset that "the relationship between Pearle Optical of Portland, Inc. and Opticks, Inc. is not clear," which we take to be a recognition of the fact such relationship, whatever it may be, was never shown. Nevertheless, the Commissioner subsequently bottomed a number of findings on the assumption that these two corporations were so structurally interlocked that the acts of Opticks, Inc. and C. R. McClintock were the acts of Pearle Optical. He found that appellant was the agent of Pearle Optical, depending on Pearle Optical for a guaranteed annual income, free rent, heat and the use of all optometric equipment. He also found that Pearle Optical could legally terminate the appellant's tenancy if it became dissatisfied with the percentage of its referrals. He further found that appellant "was employed and compensated by Pearle Optical for the purpose of examining and prescribing for Pearle Optical customers, thus permitting Pearle Optical to practice optometry indirectly." These conclusions find no support in the evidence. Granted the arrangements between Opticks, Inc. and the appellant

were unusual and such as to awaken a lively suspicion as to the motivation therefor, mere suspicion will not suffice for proof of essential facts. As to the relationship between appellant and Pearle Optical, the State has *proved* no more than a practice of mutual recommendation for appropriate services, a practice which is not forbidden by statute.

As to whether or not Pearle Optical has been shown to be practicing optometry, that depends on the construction to be given the statute. 32 M.R.S.A., Sec. 2451 defines the practice of optometry as follows:

"§ 2451.  Definitions

The practice of optometry is defined as any one or any combination of the following practices:

1. *Eye examination.* The examination of the human eye, without the use of drugs, medicines or surgery to ascertain the presence of defects or abnormal conditions which can be corrected by the use of ophthalmic lenses, prisms or ocular exercises;

2. *Mechanical means.* The employment of objective or subjective mechanical means to determine the accommodative or refractive states of the human eye or the range of power of vision of the human eye;

3. *Prescriptions.* The prescription or adaptation, without the use of drugs, medicines or surgery, of lenses, prisms or ocular exercises to correct defects or abnormal conditions of the human eye or to adjust the human eye to the conditions of special occupation and the fitting, bending and adjusting of spectacles and eyeglasses with ophthalmic lenses *for the betterment of vision;*

4. *Replacement of lens.* The replacement or duplication of an ophthalmic lens without a prescription from a person au-

---

2.  Appellant assumed that McClintock was a "representative" of Pearle Optical but possessed no factual knowledge thereof. This assumption thus rests on no more than conjecture. Proof of agency cannot be based merely on the belief of an uninformed person that an agency may exist.

thorized under the laws of this State to practice either optometry or medicine. *This subsection shall not be construed so as to prevent an optical mechanic from doing the merely mechanical work in such a case.*

An ophthalmic lens within the meaning of this section and section 2551 shall be any lens which has a spherical, cylindrical or prismatic power or value, or any lens ground pursuant to a prescription." (Emphasis ours)

The evidence discloses that on two occasions amateur investigators were sent by the Board to check on appellant's professional conduct. On the first occasion the investigator approached Pearle Optical ostensibly to purchase a frame. Apparently upon recommendation of an employee of Pearle Optical, after selecting the frame of her choice the investigator made an appointment and received an examination and prescription from appellant. She paid for this service and was orally instructed by appellant to return to his office after she received the new glasses. She returned with the prescription to Pearle Optical and approximately two weeks thereafter received delivery of the glasses. At an unspecified later time she returned to Pearle Optical "for an adjustment" of the frames. A "man behind the counter" took the glasses and "straightened them out." The condition of the glasses requiring this "adjustment" is not revealed. The evidence is likewise silent as to the nature and extent of the "adjustment" actually made. In any event the investigator never returned to appellant's office for final check on the glasses as he had requested.

On another occasion an investigator for the Board went to Pearle Optical and expressed an interest in contact lenses. Apparently on referral by Pearle Optical the investigator went to appellant for examination. After the examination for which he paid appellant, the investigator was taken by appellant to Pearle Optical. Appellant introduced the investigator to two young women who, the Commissioner could properly infer, were employees of Pearle Optical. Appellant gave the prescription to these persons and remarked, "He is from Lewiston—take good care of him." One of the women placed contact lenses in his eyes, put "Plorosene" in the eyes and examined the lenses under an ultra violet light. He paid a deposit on the order for lenses. Following instructions, he returned in two weeks and the same woman inserted the new lenses. Under instruction he wore the lenses about two hours and again returned to Pearle Optical. He was then directed to return to the appellant for a final check. Upon return to appellant as directed, he was given an examination while wearing the contact lenses. He then returned to Pearle Optical where he received instructions on how to insert and remove the lenses and other information about their use. He was asked to return after another two week interval. He had no further contact with the Pearle Optical employees, nor did he ever return to the office of appellant.

The statute does not speak with clarity and precision with respect to line of demarcation as between the adjustment and adaptation of frames and contact lenses which require the professional skill, training and experience of an optometrist and those which are essentially mechanical in nature and require a different and presumably lesser degree of knowledge and training. We note that in Sec. 2451, above quoted, subsection 3 defining one aspect of the practice of optometry includes the words, "the fitting, bending and adjusting of spectacles and eyeglasses with ophthalmic lenses for the betterment of vision". The addition of the last qualifying words seems to suggest that some "fitting, bending and adjusting" may properly be done by a person not a qualified optometrist for mechanical reasons, other than "for the betterment of vision," as for example to conform the glasses to the purposes and requirements of the prescription. Some recognition of the necessity of some purely mechanical functions is found in the sen-

tence in subsection 4 which states, "This subsection shall not be construed so as to prevent an optical mechanic from doing the merely mechanical work in such a case." In so saying, we recognize that as phrased this sentence is not directly related to the definition in subsection 3, but common sense dictates that where an optician may properly fabricate glasses and contact lenses on an optometrist's prescription, which items should be at least suitable and adaptable to the patient's use, some purely mechanical adjusting and testing may be necessary and should be permissible. The patient's primary and essential safeguard lies in the optometrist's control of the "treatment" by means of prescription and preliminary and final examination. Neither optometrist nor optician can be charged with fault if a patient who is instructed to return to the optometrist for a final verification examination fails of his own accord to do so.

In the absence of any probative expert testimony to the contrary, of which there is none in this case, we conclude that the evidence falls short of demonstrating that Pearle Optical in the two incidents described engaged in the practice of optometry as defined by statute. What is even more clear, however, is that no proven association "for profit or division of profit" between optometrist and optician "enabled" the optician to practice optometry. We recognize, of course, that, had the State been able to prove that the relationship between the appellant and Pearle Optical was the same as that which existed between the appellant and Opticks, Inc., very different considerations might have governed decision in this case.

For reasons first above stated in this opinion, the appellant is subject to penalty

imposable by the Commissioner for a proven violation of 32 M.R.S.A., Sec. 2556(7). Since we cannot know from the record before us whether or to what extent the penalty of eleven months suspension was enhanced or affected because of the Commissioner's findings of violations of Sec. 2452 and sundry rules promulgated by the Board, justice and equity require that we remand for reconsideration and the imposition of such penalty as the Commissioner deems appropriate in the light of this opinion. In doing so we offer this caveat. The record discloses that under a prior decision dated November 30, 1966, never appealed from, the Commissioner had had occasion to suspend the appellant from practice for a period of six months for "advertising his practice" and "permitting an optician to fit, bend and adjust glasses to patients for whom defendant had prescribed," which conduct may have been lawful. The operation of this penalty was suspended, however, as a matter of leniency and appellant was warned that a suspension of his license "will occur in the event of a further violation of the subject matter." In determining what if any effect should be given to this prior penalty and accompanying warning in assessing the extent of the new penalty now to be imposed, the Commissioner may wish to re-examine the nature of the proven conduct of the appellant in 1966 in the light of this opinion.[3]

The entry will be

Appeal sustained. Case remanded to the Administrative Hearing Commissioner for imposition of penalty for violation of 32 M.R.S.A., Sec. 2556(7).

WERNICK, J., did not sit.

3. In so saying, we neither intimate nor suggest what penalty should now be imposed. This lies within the sound discretion of the Commissioner under Sec. 2556.