**LEE OPTICAL OF OKLAHOMA, Inc. et al.**

v.

**WILLIAMSON, Atty.Gen. of Oklahoma et al.**

**Civ. No. 6002.**

United States District Court, W. D. Oklahoma.

March 1, 1954.

2. 4 Collier on Bankruptcy, 14th Ed. 745.

Dick H. Woods and John Phillips (of
Stinson, Mag, Thomson, McEvers & Fiz-
zell), Kansas City, Mo., and Duke Duvall

(of Dudley, Duvall & Dudley), Oklahoma City, Okl., for plaintiffs.

Fred Hansen and James C. Harkin, Asst. Attys. Gen., State of Oklahoma, Fred Daugherty, LeRoy Powers, Oklahoma City, Okl., and Paul Harkey, Idabel, Okl., for defendants.

Before MURRAH, Circuit Judge, VAUGHT, Chief Judge, and WALLACE, District Judge.

WALLACE, District Judge.

The plaintiffs bring this action under the Federal Declaratory Judgment Act [1] and challenge the constitutionality of certain provisions found in the recent Oklahoma Enactment dealing with the regulation of "visual care". [2] The statute subject to attack is commonly referred to as Enrolled House Bill No. 953 and is entitled:

"An Act relating to visual care: defining terms; prohibiting dishonest and dangerous practices in the sale of optical goods and devices; prohibiting discrimination; making the Act cumulative to other laws; making violation a misdemeanor authorizing injunction against violators."

Plaintiffs, Carp, an individual, and Lee Optical Company, an Oklahoma corporation, are "dispensing opticians"; [3] the other plaintiff, Rips, is an ophthalmologist, duly licensed to practice in Oklahoma, who offices in Tulsa, Oklahoma, in space rented from the Zales Jewelry Company. Plaintiffs Carp and Lee Optical direct their constitutional criticisms at parts of sections 2 and 3 of the instant Act; [4] plaintiff, Dr. Rips,

---

1. 28 U.S.C.A. §§ 2201, 2202. In addition, plaintiffs request an injunction against enforcement of this State statute; this necessitates the three-judge court provided for in § 2281.

2. 59 Okla.St.Ann. §§ 941–947.

3. The dispensing optician is both a craftsman and a merchant. He maintains a complete stock of frames from which the customers may make selections; these frames vary in size, shape, color and adornment. In order to fit the frames (and completed eye-glasses) to the customer's face he must have some artisan skill related to the science of optics and must have some knowledge of optical terms. As observed by A. D. Hill, a member of the National Guild of Prescription Opticians, and a Master in Ophthalmic Optics, a dispensing optician, in response to a question on just what his duties included: "A I receive ophthalmic prescriptions from the ophthalmologists, and in very rare instances optometrists; do the technical work which involves measuring the distance between the pupils, commonly known as P.D., aiding in the selection of a frame, and of course in many cases it is a matter of styling with women, and some men are a little bit particular about what type of frame they wear; so actually it's a combination of technical work plus merchandising." (Tr. 77)

In addition to the dispensing optician the field of visual care has three other definable divisions. (1) The ophthalmologist, a duly licensed medical doctor who specializes in the care of the eyes; (2) The optometrist, a quasi-professional who is trained to examine the eyes for refractive error, and at the same time recognize but not treat diseases of the eye, and who acts also as craftsman and merchant in filling prescriptions for eyeglasses; (3) The optician (or optical supplier) who is a skilled artisan qualified to actually grind lenses and perform other tasks which the dispensing optician may not be equipped to perform.

4. Section 2 states: "It shall be unlawful for any person, firm, corporation, company, or partnership * * * (not an Oklahoma licensed ophthalmologist or optometrist) to fit, adjust, adapt, or to in any manner apply lenses, frames, prisms, or any other optical appliances to the face of a person, or to duplicate or attempt to duplicate, or to place or replace into the frames, any lenses or other optical appliances which have been prescribed, fitted, or adjusted for visual correction, or which are intended to aid human vision or to give any treatment or training designed to aid human vision, or to represent or hold himself out to the public as being qualified to do any of the acts listed in this Section, except that * * * (an Oklahoma licensed ophthalmologist or optometrist) may in a written prescription, or its duplicate, authorize any optical supplier to interpret such prescription, and who in accordance therewith may measure, adapt, fit, prepare, dispense,

questions a portion of section 4.[5]

 It is recognized, without citation of authority, that all legislative enactments are accompanied by a presumption of constitutionality; and, that the court must not by decision invalidate an enactment merely because in the court's opinion the legislature acted unwisely. Likewise, where the statute touches upon the public health and welfare, the statute cannot be deemed unconstitutional class legislation, even though a specific class of persons or businesses is singled out, where the legislation in its impact is free of caprice and discrimination and is rationally related to the public good. A court only can annul legislative action where it appears certain that the attempted exercise of police power is arbitrary, unreasonable or discriminatory.[6]

or adjust such lenses, spectacles, eye glasses, prisms, tinted lenses, frames or appurtenances thereto, to the human face for the aid or correction of visual or ocular anomalies of the human eye; and may continue to do the said acts on the aforesaid written prescription, or its duplicate, provided however, that the physician or optometrist writing such prescription shall remain responsible for the full effect of the appliances so furnished by such other person. Provided that this Section shall not prevent a qualified person from making repairs to eye glasses."

Section 3 provides: "It shall be unlawful for any person, firm, company, corporation or partnership to solicit the sale of spectacles, eye glasses, lenses, frames, mountings, prisms or any other optical appliances or devices, eye examinations or visual services, by radio, window display, television, telephone directory display advertisement, or by any other means of advertisement; or to use any other method or means of baiting, persuading, or enticing the public into buying spectacles, eye glasses, lenses, frames, mountings, prisms, or other optical appliances for visual correction. Provided, however, that the provisions of this Act shall not render any newspaper or other advertising media liable for publishing any advertising furnished them by a vendor of said commodity or material; nor shall anything in this Act prevent ethical education publicity or advertising by legally qualified health groups that does not violate presently existing laws of Oklahoma, nor prevent the proper use of ethical, professional notices. Nothing in this Act shall prohibit the sale of ready-to-wear glasses equipped with convexspherical lenses nor sun-glasses equipped with plano lenses nor industrial glasses and goggles with plano lenses used for industrial eye protection when sold as merchandise at any established places of business and where the selection of the glasses is at the discretion of the purchaser."

5. Section 4 provides: "It shall be unlawful for any optometrist, physician or other person doing, or purporting or pretending to do eye examination or visual correction to receive or accept any rebate, kick-back, reward or premium from any optical company or any other person, firm or corporation dealing in optical goods, appliances or materials, or knowingly allow or permit any person engaged in or interested in the sale of such optical goods, appliances, or materials, to solicit business for any * * * (Oklahoma licensed opthalmologist or optometrist). It shall be unlawful for any optometrist, physician, or other person to make an eye examination, or do visual correction in any manner, either directly or indirectly as an employee or associate of a person, firm, corporation, lay body, organization, group or lay person and it shall be likewise unlawful for any corporation, lay body, organization, group or lay person in any manner to make an eye examination or perform any visual correction through the means of engaging the services on a salary, commission or any other compensatory basis of * * * (an Oklahoma licensed ophthalmologist or optometrist) provided that this sentence shall not apply to the University of Oklahoma School of Medicine and Hospitals, or to a bona fide resident physician of a licensed hospital. *No person, firm, or corporation engaged in the business of retailing merchandise to the general public shall rent space, sublease departments, or otherwise permit any person purporting to do eye examination or visual care to occupy space in such retail store.* Nothing in this Section shall prohibit * * * (an Oklahoma licensed ophthalmologist or optometrist) from organizing or maintaining a professional association with other persons so licensed." (Constitutional objection raised to portion emphasized.)

6. As phrased in the Court's syllabus in Adwon v. Oklahoma Retail Grocers Ass'n, Inc., 1951, 204 Okl. 199, 228 P.2d 376, 377: "The Legislature is itself the judge of the conditions which warrant legislative enactments, and they are only to be

The Attorney General, in urging the validity of the Act in question, emphasizes that the general purpose and intent of the Act, as evidenced by the title's broad scope, is to make certain that the people of Oklahoma receive the best possible visual care;[7] and, argues that to achieve such a goal it is imperative that the entire field of visual care (or responsibility therefor) be under the direct supervision and administration of professional practitioners (either physicians or optometrists) with all non-licensed artisans and commercial interests prohibited from activity except pursuant to professional written prescriptive authority.

■ Unquestionably, many aspects of the field of visual care are of sufficient public interest to warrant the operation of police power authority, and many regulatory measures directed toward protecting the public in regard to

eye care have been judicially sanctioned.[8] However, the manner and extent to which the definable segments which compose the entire field of visual care can be controlled, like all other objects of legislative regulation, is limited by that line wherein to cross-over is to step into the area of arbitrariness, unreasonableness and lack of rationality between the proposed control and the actual welfare of the public. Significantly, the "field of visual care", in its broadest aspect, occupies a rather unique position. The services rendered therein include those exclusively professional, those quasi-professional, those artisan and those strictly mercantile in character; and, each of these services has evolved into separate and distinct class of private endeavor.[9]

■ Although the artisan, the merchant, as well as the professional may be regulated in any field where the regulated efforts bear directly upon the public

set aside when they involve such palpable abuse of power and lack of reasonableness to accomplish a lawful end that they may be said to be merely arbitrary, capricious, and unreasonable, and hence irreconcilable with the conception of due process of law."

As observed by Mr. Justice Burton in the recent case of Salsburg v. State of Maryland, 74 S.Ct. 280, 284, fn. 9: "'* * * It is * * * a maxim of constitutional law that a legislature is presumed to have acted within constitutional limits, upon full knowledge of the facts, and with the purpose of promoting the interests of the people as a whole, and courts will not lightly hold that an act duly passed by the legislature was one in the enactment of which it has transcended its power.' Atchison, T. & S. F. R. Co. v. Matthews, 174 U. S. 96, 104, 19 S.Ct. 609, 612, 43 L.Ed. 909. 'A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it.' Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070. See also, Middleton v. Texas Power & Light Co., 249 U.S. 152, 157–158, 39 S.Ct. 227, 228–229, 63 L.Ed. 527; Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S. Ct. 337, 340–341, 55 L.Ed. 369."

7. This distinguishes the instant case from Palmer v. Smith, 1948, 229 N.C. 612, 51 S.E.2d 8 and Kindy Opticians, Inc., v. Michigan State Board of Examiners, 1939, 291 Mich. 152, 289 N.W. 112, inasmuch as the primary issue before those courts was whether certain artisan practices constituted a practice of optometry.

8. See, for example, Roschen v. Ward, 1929, 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722; Commonwealth v. S. S. Kresge Company, 1929, 267 Mass. 145, 166 N.E. 558; Ritholz v. Commonwealth, 1954, 184 Va. 339, 35 S.E.2d 210.

9. The origin of the ophthalmologist, the pure professional, is identical to that of other medical doctors, or physicians; however, he has specialized in eye care. The optometrist, the quasi-professional, evolved from an artisan-merchant beginning to the place where certain professional training and experience has qualified him to examine eyes for refraction and recognize although not treat diseases of the eye; in addition, he has retained the artisan-merchant characteristic and continues to fill prescriptions and market the completed spectacles. The optician (whether a dispensing optician or an optical supplier) continues as a skilled artisan and a merchant who sells both services and goods.

health and welfare,[10] none can be restricted where the particular acts regulated do not involve matters of public interest; and, where a general field of endeavor is specifically composed of definable activities, some of which pertain to public health and welfare and others of which do not, the non-related activities cannot be regulated merely because of proximity of position. Control must cease when we pass from matters touching public welfare into matters historically mercantile and not rationally related to the public good; and, even where the public welfare is involved, the effect of the statute must bear a reasonable relation to the purpose to be accomplished[11] and must not discriminate between two similarly circumstanced groups, regulating one group but exempting the other.[12]

Clearly, that phase of visual care which deals with the actual examination of the eyes (whether for pathology or refraction)[13] together with promotional advertising which brings direct mercantile pressure upon the public to submit to examinations and to purchase spectacles, is subject to legislative control.[14] Although the evidence in the instant case indicates that no permanent injury to the eye can result from eyeglasses which concededly are misfitted,[15] the importance of accurate sight and seeing comfort (that is, a freedom from nervousness and other minor irritations which can result from ill-fitted spectacles) brings this segment of visual care squarely within the sphere of police power authority. Unquestionably, the general health and welfare could suffer as a result of promiscuous and indiscrim-

10. The test is not whether the service is professional, artisan or merchant, but whether the services rendered and merchandise sold directly relate to the public health and welfare. However, historically, there has been considerable correlation between the education and experience required to qualify a person for specific tasks, and the importance such tasks carry with regard to the public good. Thus, the true or learned professions, almost without exception, have been subjected to statutory regulation for the public's protection; and, where certain crafts and businesses which have existed for a considerable length of time and operated entirely free from regulation are prohibited or severely restricted the public necessity for such legislative control must be definite and not merely fanciful.

11. Liggett Company v. Baldridge, 1928, 278 U.S. 105, 111, 49 S.Ct. 57, 73 L.Ed. 204; Lawton v. Steele, 1893, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385.

12. Royster Guano Company v. Com. of Virginia, 1920, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989; Colgate v. Harvey, 1935, 296 U.S. 404, 422, 423, 56 S.Ct. 252, 80 L.Ed. 299; Old Dearborn Distributing Company v. Seagram Distillers Corporation, 1936, 299 U.S. 183, 197, 57 S.Ct. 139, 81 L.Ed. 109. Also, see People v. Weiner, 1915, 271 Ill. 74, 110 N.E. 870, L.R.A.1916C, 775.

13. "* * * In furtherance of its general purpose and to carry out the details of its plan of regulation, the Legislature could properly vest the board (of examiners) with power to make regulations reasonably adapted to assure the competency of optometrists and to prevent conduct on their part which would tend to do harm to the public. (Citing cases.)" Sage-Allen Co. v. Wheeler, 1935, 119 Conn. 667, 179 A. 195, 200, 98 A.L.R. 897.

14. State v. Rones, 1952, 223 La. 839, 67 So.2d 99; Ritholz v. Commonwealth, 1945, 184 Va. 339, 35 S.E.2d 210; Commonwealth v. Ferris, 1940, 305 Mass. 233, 25 N.E.2d 378.

15. As mentioned by Dr. Tullos O. Coston, eminent ophthalmologist: "Q. In that connection, Doctor, if a person has a refractive error in his eye, and doesn't obtain glasses, is his eye going to be damaged or injured in any way? A. There will be no change in the anatomical structure of the eye, there will be no damage whatever whether he wears proper glasses or does not." (Tr. 38, 39)

"I think you would have a very difficult time in demonstrating that any person is definitely damaged by being supplied with glasses that are not perfect correction of his refractive error." (Dr. Benedict, dep. p. 41)

inate fittings of eyeglasses by persons unqualified to examine the eyes, particularly where the examiners were not qualified to recognize, even if not treat, various diseases of the eye; and, in a more limited sense the health and welfare would be adversely affected if en masse the people wore improperly refracted eyeglasses which impaired the over-all seeing ability and comfort of the spectable wearing public.

■ Although much of the Act under consideration constitutes a legitimate exercise of the legislative police power, this Court, without impliedly sanctioning all other portions of this Act, is of the opinion that this legislation in impact is unconstitutional at the following three points:

### I

Those portions of section 2, which make it unlawful for any person not a licensed optometrist or ophthalmologist, "To fit, adjust, adapt or to in any manner apply lenses, frames, prisms, or any other optical appliances to the face of a person * * *" or "to duplicate or attempt to duplicate or to place or replace into the frames, any lenses or other optical appliances which have been prescribed, fitted or adjusted for visual correction, or which are intended to aid human vision * * *" except upon written prescriptive authority of an Oklahoma licensed ophthalmologist or optometrist.

The unambiguous language of section 2 makes it unlawful, among other things, for either a dispensing or laboratory optician to take old lenses and place them in new frames and then fit the completed spectacles to the *face* of the eyeglass wearer except upon written prescription from a qualified eye examiner. Obviously, this serves to prohibit the wearers of eyeglasses from exchanging their frames either to obtain more modern designs or because the former frames are broken, without first visiting an ophthalmologist or optometrist; and, which in turn diverts from the optician a very substantial, as well as profitable, part of his business.[16]

The evidence indicates, almost without variance, that written prescriptions issued by the professional examiner contain no directive data in regard to the manner in which the spectacles are to be fitted to the face of the wearer. In addition, the Court is satisfied that the mere fitting of frames to the face, where the old lenses are available, is in reality only an incident to what fundamentally is a merchandising transaction, that is, the sale of a pair of frames; and, in any event, the knowledge necessary to perform these services is strictly artisan in character and can skillfully and accurately be performed without the professional knowledge and training essential to qualify as a licensed optometrist or ophthalmologist.

Although, as emphasized previously, the legislature can regulate the artisan, the merchant, or the professional where the regulated services embrace issues of public health and welfare, the services under consideration bear no real or rational relation to the actual vision of the public. *Prospective* wearers of eyeglasses are not affected inasmuch as a person seeking this particular service must already possess a pair of eyeglasses; and, *present* wearers of eyeglasses are not imperiled inasmuch as such wearers have previously submitted to examinations by professional men at the time the original pairs of spectacles were obtained.

It is most important to note that the flexibility of the human eye, with particular emphasis on the service now be-

16. As demonstrated by the evidence the dispensing optician has two things to sell, lenses and frames. If prosecutive purchasers of frames are required to go to an ophthalmologist or optometrist to get an ophthalmic prescription, inasmuch as the optometrist fills all of his own prescriptions (and actually sells between 60–70% of the eyeglasses sold) the inevitable effect will be to deprive the optician of a sizeable amount of trade.

ing discussed, is such as to assure the eyeglass wearing public of good vision even where succeeding frames when fitted to the face are not always fitted in the same manner. Dr. Tullos O. Coston, in testifying in regard to the actual refraction of the eye, accented the liberality which prevails in connection with visual correction:[17]

"* * * What we aim to do in a refraction, I think that sometimes we get mixed up in technical things too much. The aim of proper refraction is first of all to have the best vision that the glasses will give the patient, plus comfort. Now if the glasses are fitted improperly, and a number of times that will be true, because the patient subjectively didn't give you the proper answers, or maybe the doctor was a little careless that morning, but if he gets the glasses and he sees well, and has no discomfort, suppose that a mistake had been made somewhere, it is of no importance. You fit the patient with glasses to make him see the best you can, with comfort. *Now technically whether you've got it on this axis or that axis is of absolutely no importance,* and you find people wearing the screwiest type of glasses, that when you get through examining them, your reading and your interpretation of what they need is exactly different to what they have worn, but they have been quite comfortable and they have seen well with what they have had.

"Now you have two choices. You can let them wear what they have, or you can give them a new pair of glasses, and very often we let them wear what they have had, if financial matters enter into it. *You can't say that the eye is like a piston in a cylinder, you don't have to fit it to that tolerance.*" (Emphases supplied.)

If such be true in regard to the actual examination of the eyes for refraction, even more so such must be true in regard to the mere placing of original lenses in new frames and placing the frames to the face of the wearer. The legislature cannot control these specific functions, and in effect deprive opticians of their right to freely pursue a lawful calling, under the guise that such control is reasonably and rationally related to the health and welfare of the people.

The effect of section 2 which prohibits the duplication of existing lenses (that is, the preparation of a completely new set of spectacles) without a *written* prescription is also unconstitutional.

The evidence establishes beyond controversy that a skilled artisan (such as an optician) can accurately ascertain the power of a lense, or fragment thereof, without the aid of a written prescription, and can thus duplicate or reproduce the original pair of spectacles without adversely affecting the visual ability of the eyeglass wearing public. This process requires no unusual professional judgment, peculiar to the licensed professions of ophthalmology and optometry but is strictly artisan in character. The power of the originally prescribed lense, or fragment thereof, can be learned by the use of a mechanical device known as the lensometer; this device (whether being operated by a professional or layman) scientifically measures the power of the existing lense and reduces it to prescriptive terms.[18]

Obviously, the accuracy of the lensometer operation is only commensurate to the care and skill exercised by the operator; and, logically, the vision of eyeglass wearers could be impaired somewhat by a careless commercial usage of

17. (Tr. 71-72).

18. Significantly, the court in Palmer v. Smith, 1948, 229 N.C. 612, 51 S.E.2d 8, 11, concluded from the evidence there adduced: "It is undisputed on the record that a qualified optician can take a whole or broken lense and by use of a vertometer or lensometer, duplicate such lense with accuracy and exactness. The process of duplication is conceded to be a purely mechanical one."

this machine resulting in the mass production of lenses which were not accurate duplications of the original prescriptions.

Although on this precise issue of duplication, the legislature in the instant regulation was dealing with a matter of public interest, the particular means chosen are neither reasonably necessary nor reasonably related to the end sought to be achieved. As observed in the classic case of Lawton v. Steele [152 U.S. 133, 14 S.Ct. 501]:[19]

" * * * To justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that *the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.* (Emphasis supplied.)

It is absolutely unnecessary to delegate to professional men the control of and responsibility for the just-mentioned artisan tasks, where the opticians, as a group possess adequate skill to fully protect the vision of the public in accurately duplicating existing lenses. The operation of the lensometer does not rise to the need or dignity of exclusive professional supervision. A qualified witness demonstrated and testified that any reasonably intelligent person can be taught to operate the lensometer and become qualified to accurately learn the power of existing lenses, or fragments thereof, within several hours. As further demonstrated by the evidence, the opticians, as a class, have for a number of years used the lensometer in their trade and the optometrists and ophthalmologist use this same device when wishing to check the power of lenses; and, although only a minority of licensed ophthalmologists require a patient to return to the examiner's office to check the accuracy with which the original prescription has been filled, even in such instances the lensometer is not operated by the physician but by a clerk in the office.

The legislature has been guilty of undue oppression in failing to set up qualifying standards for the opticians, if such standards be necessary for the public protection, and at the same time arbitrarily legislating many of the skilled artisans out of a long recognized trade, by delegating the sole control of their skills and business to a professional group,[20] when the public can be completely protected without taking from the optician this valuable property right.[21]

---

19. Fn. 11, supra.

20. The effect of section 2 is to place within the exclusive control of optometrists and ophthalmologists the power to choose just what individual opticians will be permitted to pursue their calling inasmuch as where the professional men must first give a written prescription and then "remain responsible for the full effect of the appliances so furnished by such other person" the ophthalmologists will pointedly refer their business to a limited number of channels, thus denying all other opticians the opportunity to follow their trade regardless how competently the remaining opticians are qualified. As shown by Dr. Coston's testimony: "Q. Doctor, I will ask you if under the law of Oklahoma, you are held liable for the glasses dispensed pursuant to a prescription of yours, will you issue prescriptions and permit them to be taken to any optician that patient might choose? A. No. Q. What will you do if that is the situation, assuming what I have said is the law? A. Patient will be directed to an optician I know to be reputable and reliable." (Tr. 51) Obviously, the optometrists will refer little if any business to the opticians inasmuch as they are competitors.

21. If the function of the optician is such as to require licensing, the legislature can proceed to establish standards which must be met before an optician can be registered and forbid the practice of opticianary by non-registered opticians, just as has been provided in regard to pharmacists. (See 59 Okl.St.Ann. § 331 et seq.) The action by the legislature in the instant act is as unreasonable as if pharmicists were divested of their right

Also, on this specific point under consideration, the legislature did not act in accordance with the requirement pronounced by Mr. Justice Sutherland in Liggett Company v. Baldridge [278 U.S. 105, 49 S.Ct. 59] :[22]

"The act is sought to be sustained specifically upon the ground that it is reasonably calculated to promote the public health; and the determination we are called upon to make is whether the act has a real and substantial relation to that end or is a clear and arbitrary invasion of appellant's property rights guaranteed by the Constitution."

The means chosen by the legislature does not bear "a real and substantial relation" to the end sought, that is, better vision, inasmuch as although admittedly the professional eye examiners are specially trained in regard to eye examination, they possess no knowledge or skill superior to a qualified practicing optician insofar as the artisan tasks in view are concerned, and in fact the two professional groups, as a class, are not as well qualified as opticians as a class to either supervise or perform the services here regulated.

In addition, and of even more significance, is the fact that section 3 exempts from regulation all sellers of ready-to-wear glasses,[23] even though such sellers, from the viewpoint of public health and welfare, lie within the identical class and circumstance occupied by "fitters and sellers of frames" and "duplicators of lenses and entire spectacles."

The rule is clear that where the police power is ushered into play it must be exercised in an undiscriminating manner in relation to all persons falling within the same class or circumstance. This principle was enunciated in Royster Guano Company v. Com. of Virginia wherein the Court said :[24]

"It is unnecessary to say that the 'equal protection of the laws' required by the Fourteenth Amendment does not prevent the states from resorting to classification for the purposes of legislation. Numerous and familiar decisions of this court establish that they have a wide range of discretion in that regard. *But the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of. the legislation, so that all persons similarly circumstanced shall be treated alike.* \* \* \* " (Emphasis supplied.)

In the instant legislation not only is the "relation to the object of the legislation" questionable (as previously discussed) but "all persons similarly cir-

---

to do business by legislative action which delegated to physicians the absolute control and responsibility for accurate *compounding* of medical prescriptions for the reason that a physician alone is qualified to *prescribe* drugs for patients.

Obviously, the opticians do not possess qualifications which would enable them to become licensed ophthalmologists or optometrists. As observed in Smith v. Texas, 1914, 233 U.S. 630, 638, 34 S.Ct. 681, 683, 58 L.Ed. 1129; "\* \* \* in the exercise of the police power, the state may prescribe tests and require a license from those who wish to engage in or remain in a private calling affecting the public safety. The liberty of contract is, of course, not unlimited; but there is no reason or authority for the proposition that conditions may be imposed by statute which will admit some who are competent and arbitrarily ex- clude others who are equally competent to labor on terms mutually satisfactory to employer and employee. None of the cases sustains the proposition that, under the power to secure the public safety, a privileged class can be created and be then given a monopoly of the right to work in a special or favored position. *Such a statute would shut the door, without a hearing, upon many persons and classes of persons who were competent to serve, and would deprive them of the liberty to work in a calling they were qualified to fill with safety to the public and benefit to themselves."* (Emphasis supplied.) Cf. People v. Brown, 1950, 407 Ill. 565, 95 N.E.2d 888.

22. Fn. 11, supra.

23. See Fn. 4, supra.

24. Fn. 12, supra, 253 U.S. at page 415, 40 S.Ct. at page 561.

"cumstanced" pointedly have not been treated alike. Persons who sell frames (incidentally adapting and fitting the completed spectacles to the face), persons who duplicate original eyeglasses and market the duplicated spectacles, and persons who sell ready-to-wear glasses are identically situated; that is, all are sellers of merchandise which is not immediately connected with or supervised by a professional eye examiner. Yet the public health and welfare is touched in the same manner and degree by each of these groups inasmuch as the possible result is exactly the same; people may wear spectacles which are not best suited for their eyes.

The legislature must not blow both hot and cold! If it be desirable for the public protection that opticians sell merchandise and service only upon written prescriptive authority, the legislature cannot at the same time permit the unsupervised sale of ready-to-wear (convex spherical lenses) eyeglasses. The mere fact the public selects at will from the counter serves as no basis for distinction; if such constitutes a distinction then the public should have the equal right to purchase new frames or duplicate prescription eyeglasses at will.

In reality, the unrestricted sale of ready-to-wear eyeglasses doubtless is more perilous than the practices prohibited by section 2. It is certain that the customer purchasing new frames, or duplicate lenses and frames, has at some time been to a qualified eye examiner, one qualified not only to refract the eyes but qualified also to recognize diseases of the eye; whereas, the purchaser of ready-to-wear eyeglasses has not even been provided with the safeguard of an initial examination.

An example of unlawful discrimination between business groups similarly situated but wherein the legislature artificially attempted to place the businesses in two different classes is found in the case of People v. Weiner, wherein the court in dealing with a statute which forbade the use of secondhand material in the making of mattresses (for sanitary reasons) but placed no such restriction in regard to the making of pillows, held that the attempted classification was arbitrary and unreasonable and in doing so said: [25]

"Counsel * * * argue that there is a discrimination between the manufacturers and dealers in pillows and manufacturers and dealers in mattresses, comforters, and quilts, especially after they have been used, as there is no provision made as to pillows; that, so far as this act is concerned, material made secondhand in the same way as the material in mattresses may again be made into pillows and sold without any regulation whatever. Under the decisions of this state this is class legislation. (Citing authorities.) The provisions of sections 1 and 2 of the act are arbitrary and unreasonable, and must be held unconstitutional and void."

Inasmuch as there is no real difference between ready-to-wear spectacles and prescription eyeglasses, insofar as the public's need for properly fitted eyeglasses is concerned, to regulate prescription eyeglasses, as done in section 2, and yet express the exempt ready-to-wear eyeglasses constitutes an unreasonable and discriminatory classification in contravention to the equal protection clause of the Fourteenth Amendment.

## II

That portion of section 3 which makes it unlawful "to solicit the sale of * * * frames, mountings * * * or any other optical appliances".

As mentioned previously, the legislature has the authority to regulate and control "bait advertising", that is, advertising which not only tends to persuade the public to submit to eye examinations but also tends to result in the purchase of completed pairs of specta-

25. Fn. 12, supra, 110 N.E. at pages 873, 874.

cles.[26] Clearly it is against the best interest of the public to have the number of eyeglasses worn determined by mercantile practices rather than the actual visual need of the people. Where advertising, which when uncontrolled, encourages such a condition the right of the legislature to supervise this segment of the field of visual care is identical with the legislature's right to supervise the fields of medicine and dentistry.[27]

Thus, any statute which regulates advertising in regard to eye examinations (that is, for eye diseases and for refraction, by one qualified to recognize, if not treat, diseases of the eye) or other advertising which promotes the sale of complete eyeglasses (particularly the original pair)[28] upon mere merchandising principles rather than in regard to the actual visual need, can be deemed rationally related to the public health and welfare. However, where a statute, such as the provision under consideration, intrudes into a mercantile field only casually related to the visual care of the public and restricts an activity which in no way can detrimentally affect the peo-

26. Fn. 14, supra. In approving that line of authority which holds that the legislature has power to regulate advertising by retail dealers of eyeglasses, the Court in the very recent case of State v. Rones, fn. 14, supra, 67 So.2d at page 105, commented: " * * * These courts have decided that the statutes are a reasonable exercise of the police power because they prevent 'bait advertising' which attracts the unwary to purchase inferior glasses; eliminate the temptation to, and the pressure upon, customers that result from the assurance that no more than a named price will be charged; protect an uncautious and unwary public from being misled and deceived; prevent the increase in sales and the incidental harm that come from unfitted eyeglasses; eliminate to some extent poor quality and poor workmanship which naturally result from the desire to sell spectacles in quantity at a low advertised price for the purpose of underselling competitors."

Advertising which tends to mislead the public into thinking the advertiser is qualified to practice professionally is likewise subject to regulation. See Curtis v. Registered Dentists of Oklahoma, 1943, 193 Okl. 233, 143 P.2d 427, at page 429, wherein the Court said: " * * * we are of the opinion that it is apparent that it was the intention of the legislature to protect the public from any person who might undertake to engage in the practice of dentistry without license to do so, and that part of its purpose was to prevent any one other than licensed dentists supplying artificial substitutes for natural teeth to the persons who would use them. An examination of the stipulation of facts discloses that defendant, who had no license to practice dentistry, was engaged in the business of supplying substitutes for natural teeth to the public at large through advertise-

ments in the newspaper and the telephone directory which patently were designed to induce the public to believe that the defendant was authorized to engage in the practice of dentistry by supplying artificial substitutes for natural teeth."

27. As mentioned in Semler v. Oregon State Board of Dental Examiners, 1935, 294 U. S. 608, 612, 55 S.Ct. 570, 572, 79 L.Ed. 1086; "The state court defined the policy of the statute. The court said that while, in itself, there was nothing harmful in merely advertising prices for dental work or in displaying glaring signs illustrating teeth and bridge work, it could not be doubted that practitioners who were not willing to abide by the ethics of their profession often resorted to such advertising methods 'to lure the credulous and ignorant members of the public to their offices for the purpose of fleecing them.' The legislature was aiming at 'bait advertising.' 'Inducing patronage,' said the court, 'by representations of "painless dentistry," "professional superiority," "free examinations," and "guaranteed" dental work' was, as a general rule, 'the practice of the charlatan and the quack to entice the public.' * * * "

28. This parenthetical observation is made because the Court believes that the primary basis of the legislative authority is the fact that the public should not be induced to become eyeglass wearers under the same conditions they are induced to purchase ordinary mercantile commodities. Once a person has been properly examined and has become a spectacle wearer, advertising in regard to even a completed set of eyeglasses presents very little evil as to him although it may still be of public interest to control advertising, with accompanying competitive practices, which may result in the production of inferior optical merchandise and service.

ple, such an intrusion is unconstitution-al.[29]

Naturally, where a commodity being sold is so closely associated with the administration of medical treatment to a patient that the commodity itself becomes a mere incident to and actually a part of the medical treatment being rendered, becoming part and parcel of the professional judgment being exercised on behalf of the patient, then the commodity is subject to complete control and regulation; as observed by Mr. Chief Justice Hughes in Semler v. Oregon State Board of Dental Examiners [30] such a condition exists in dentistry:

"We do not doubt the authority of the state to estimate the baleful effects of such methods and to put a stop to them. The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of market place."

However, this Court discerns utterly no analogy between the danger inherent in uncontrolled dental advertising, and advertising by dispensing opticians, or others, of various styles of frames, mountings and other modern and improved optical appliances, where such advertising omits the promotion and display of lenses or complete eyeglasses and makes no reference to eye examinations. Publicity limited strictly to frames can be deemed nothing more than straight merchandising inasmuch as it has no real relation to the vision of the public and should only be subject to those limitations recognized generally in regard to ethical mercantile advertising.

Inasmuch as a large majority of the eyeglass wearing public have more than one set of eyeglasses they are, from time to time in the market for new frames, not only to replace broken ones but to

---

29. The effect of the instant statute, which even prohibits the display of frames in a show window, must be sharply distinguished from Commonwealth v. S. S. Kresge Co., 1929, 267 Mass. 145, 166 N.E. 558, 560, 561, wherein the court said: "It seems to us that the statute here in question conforms to every requirement for validity thus laid down and is not obnoxious to any one of them. The defendant is undertaking to invade under the guise of private mercantile business a field rightly sequestered, by the Legislature in the interests of the public health (that is, the fitting to the eyes and sale of completed ready-to-wear spectacles), to those possessing special skill and training in a specified department of treatment of human ills."

In addition, although the field of visual care has been the object of *regulation* in regard to advertising (see fn. 14, supra) this Court knows of no instance where a legislature has utterly *prohibited* all forms of advertising, except the Louisiana Legislature. (See LSA–R.S. 37:1041 et seq.). Significantly, the Louisiana Supreme Court in the Rones case, fn. 14, supra, 67 So.2d at page 106, although ruling that § 1063(9) of the Louisiana Act which prohibited any retailer from ad-

vertising optometric services or spectacles "as free or for a price", was constitutional, the Court by way of dictum remarked that as to § 1065 (the section completely prohibiting advertising of any form) "a plea of unconstitutionality might have merit." Distinguish the instant legislation from the issue in City of Springfield v. Hurst, 1944, 144 Ohio St. 49, 56 N.E.2d 185, 186 wherein a city ordinance was held constitutional which forbade "advertisement by newspaper, radio, display or otherwise, *any statement advertising the price of lenses, or of complete eyeglasses*, including lenses, either with or without professional services or credit terms, instalment payments or price plans, or the price of any frames or mountings, *unless in conjunction therewith the words, 'without lenses' appear in such manner to be clearly discernible, or read in such manner as to be clearly understood.*" (Emphasis supplied); and, likewise distinguish Klein v. Department of Registration and Education, 1952, 412 Ill. 75, 105 N.E.2d 758 which had to do with the restricting of certain kinds of advertising by optometrists.

30. Fn. 27, supra, 294 U.S. at page 612, 55 S.Ct. at page 572.

acquire those more modern in appearance as the frame has become an integral part of the present-day cosmetology. Advertising directed exclusively at this feature of eye wear can have no deleterious effect on the public, inasmuch as it has no influence on the *prospective* wearer of eyeglasses, and to the *present* wearer (a person already examined by a licensed professional) is but a mere piece of merchandise.

The dispensing optician, a merchant in this particular, cannot arbitrarily be divested of a substantial portion of his business upon the pretext that such a deprivation is rationally related to the public health.

### III

■ That portion of section 4 which provides that: "No person, firm, or corporation engaged in the business of retailing merchandise to the general public shall rent space, sub-lease departments, or otherwise permit any person purporting to do eye examination or visual care to occupy space in such retail store".

■ Unquestionably the legislature has the authority to prohibit corporations from practicing Ophthalmology and Optometry in Oklahoma; and, insofar as section 4 moves inferentially toward such a goal, the legislature has acted within its authority.[31] As stated in Sears Roebuck & Company v. State Board of Optometry.[32]

"In a clear and comprehensive opinion the chancellor examined the statutes, and said in part as follows: 'The weight of modern authority is against such arrangements as we have here (i. e. corporate practice in the field of optometry), and the question presented is whether the optometrist is working for the defendant companies, as an employee, or for himself as a licensed and independent practitioner.

" '*It is only in the latter capacity that his status could be legal and his license authoritative in professional relation and service to the public.*'" (Emphasis supplied.)

And as recognized in Neill v. Gimbel Bros., Inc.:[33]

" * * * We cannot pronounce arbitrary or irrational the placing of optometry on a professional basis. This conclusion finds support in other jurisdictions. (Citing cases.)

\* \* \* \* \*

" * * * The Legislature has the right to forbid such practice as contrary to public policy, which is properly concerned with the maintenance of high professional standards. *One who practices a profession is apt to have less regard for professional ethics and to be less amenable to regulations for their enforcement when he has no contractual obligations to the client, does not fix or receive the fees, and is under the control of an employer whose commercial interest is in the volume of sales of merchandise effected by the prescriptions of the employee-practitioner.*" (Emphasis supplied.)

However, to forbid the renting or subleasing of quarters from retail merchants in order to enforce the legislative prohibition against corporate practice constitutes an arbitrary interference with the right of contract.

■■ Concededly, as some of the cases illustrate, corporate practice has taken place where corporations sublease space to professional eye examiners. However, the correlation between the evil sought to be prevented and the one circumstance singled out and prohibited is not sufficient to authorize such a police power regulation. As mentioned in Treigle v. Acme Homestead Association:[34]

31. See fn. 5, supra.

32. 1952, 213 Miss. 710, 57 So.2d 726, 730.

33. 1938, 330 Pa. 213, 199 A. 178, 182.

34. 1936, 297 U.S. 189, 197, 56 S.Ct. 408, 411, 80 L.Ed. 575.

"* * * Though the obligations of contracts must yield to a proper exercise of the police power, and vested rights cannot inhibit the proper exertion of the power, it must be exercised for an end which is in fact public and the means adopted must be reasonably adapted to the accomplishment of that end and must not be arbitrary or oppressive."

And as observed in State of Indiana ex rel. Anderson v. Brand: [35]

"Our decisions recognize that every contract is made subject to the implied condition that its fulfillment may be frustrated by a proper exercise of the police power but we have repeatedly said that, in order to have this effect, the exercise of the power must be for an end which is in fact public and the means adopted must be reasonably adapted to that end * *."

We believe the means chosen in this particular instance is "arbitrary and oppressive" and not reasonably adapted to the accomplishment of the end sought, that is, the abolition of corporate practice in the professions of ophthalmology and optometry. As evidenced in the Sears Roebuck & Company case, supra, even though a leasing arrangement can be used to attempt to evade a corporate practice prohibition, nonetheless, the fact of statutory violation can be established by competent proof of the kind and character used to prove any other statutory breach.

Whether a professional man indulges in corporate practice, in violation of a statutory prohibition, is a matter of his individual integrity rather than his geographic location.

The instant prohibition is just as unreasonable as if the legislature, in order to aid in the enforcement of certain criminal statutes, banned the use of automobiles by the general public because law violators use automobiles in their illicit operations.

### Conclusion.

It is the opinion of this Court that the plaintiffs are entitled to a permanent injunction restraining and enjoining the defendants Mac Q. Williamson, Granville Scanland, Robert L. Wheeler, and all remaining County Attorneys in the State of Oklahoma from enforcing or attempting to enforce against the plaintiffs [36] the provisions of sections 2, 3 and 4 which have been designated as unconstitutional in this written opinion.[37]

---

35. 1938, 303 U.S. 95, 108, 58 S.Ct. 443, 450, 82 L.Ed. 685.

36. The Court recognizes that the legislature has the authority to prevent "bait-advertising" and other evils associated therewith in the nature of corporate practice; and, that the instant plaintiffs at this time may be engaged in practices which rightly can be prohibited by the legislature in a valid enactment; however, the legislature cannot, as here attempted, kill the patient in order to eliminate the disease.

37. The Attorney General has not urged that the plaintiffs are not entitled to equitable relief even though certain provisions of the instant Act have an unconstitutional impact upon the plaintiffs. However, this Court is not unmindful of the cardinal principle that Federal courts of equity should not interfere with the processes of the criminal law in State courts or determine questions of criminal liability under those laws, unless in most exceptional circumstances in order to prevent irreparable loss. Beal v. Missouri Pac. R. Co., 1940, 312 U.S. 45, 50, 61 S.Ct. 418, 85 L.Ed. 577 and "* * * the imminence and immediacy of proposed enforcement, the nature of the threats actually made, and the exceptional and irreparable injury which complainants would sustain if those threats were carried out are among the vital allegations which must be shown to exist before restraint of criminal proceedings is justified." Watson v. Buck, 1941, 313 U.S. 387, 400, 61 S.Ct. 962, 966, 85 L.Ed. 1416. Cf. Spielman Motor Co. v. Dodge, 1935, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322.

The plaintiffs' allegations, together with the undisputed proof, indicate that immediate and unrelenting enforcement of all the provisions of this Act, provisions clear in meaning and intent, by the defendant state officers, is imminent; in

Counsel should submit a journal entry to conform with this opinion within 15 days.

VAUGHT, Chief Judge, concurring.

MURRAH, Circuit Judge (dissenting in part).

With reluctance and some misgivings, I concur in that part of the judgment of the court declaring unconstitutional the legislative prohibitions against fitting, adjusting, adapting or applying lenses, frames, prisms or other optical appliances to the face of a person, or duplicating or replacing the same without prescriptive authority of a licensed ophthalmologist or optometrist.

The obvious result of this legislation is to appropriate a property right of one class to follow a legitimate calling or occupation and to give it to another class not shown to be more competent in the public interest. Indeed, the evidence shows that it would be inimical to the public interest to require the wearer of

---

fact, defendants' counterclaim in this suit specifically demands injunctive relief against the plaintiffs as authorized by section 6 of the instant Act. The inevitable result of the enforcement of the provisions found by this Court unconstitutional in points I and II of the opinion, as applied to the two dispensing optician plaintiffs, will be to literally put said plaintiffs out of business; unquestionably, from such an injury there can be no adequate remedy at law and that such will result is not conjectural but positive. The effect of the enforcement of the Act on the unconstitutional feature discussed in point III of the opinion, as applied to plaintiff, Dr. Rips, although not resulting in putting Dr. Rips clear out of business, will be to compel said plaintiff to relinquish a very desirable and valuable lease and to move to another place of business. Insofar as all plaintiffs are concerned no adequate remedy is available; the State cannot be held responsible for the business loss of the two dispensing optician plaintiffs or the loss of a lease by plaintiff Rips, valued at more than $5,000; and, certainly a lessor cannot be held responsible for cancelling a lease in conformity with a state criminal law requirement (notice of cancellation of which has already been given).

It is contrary to the spirit of reason as well as equity to direct these plaintiffs to choose between complying with all provisions of the instant Act, thus submitting to irreparable and irrecoverable business losses while the constitutionality of the provisions of the statute are tested; or, to continue in business, thus violating the clear language of the criminal law countless numbers of times each day in the hope that eventually such prosecutions will prove unsuccessful because of the unconstitutional nature of the criminal statute. Significantly, section 6 of the instant Act provides: "Any person, firm * * * violating any of the provisions, of this Act shall be guilty of a misdemeanor and upon conviction thereof shall be punished for each such offense, as provided by law * * *"; and, 21 Okl.St.Anno. § 10 states that " * * * every offense declared to be a misdemeanor is punishable by imprisonment in the county jail not exceeding one year or by a fine not exceeding five hundred dollars, or both such fine and imprisonment. * * *" What facts could more pointedly justify the exercise of equitable authority than these—where the plaintiffs are faced with both an injunctive prohibition and a liability for multiple criminal prosecutions. See Toomer v. Witsell, 1947, 334 U.S. 385, 391, 68 S.Ct. 1156, 92 L.Ed. 1460. Also, see Parker v. Brown, 1942, 317 U.S. 341, 349, 63 S. Ct. 307, 87 L.Ed. 315; Family Sec. Life Ins. Co. v. Daniel, D.C.S.C. 1948, 79 F.Supp. 62, reversed on other grounds 336 U.S. 220, 69 S.Ct. 550, 93 L.Ed. 632. As observed by the three judge court in Russo v. Reed, D.C.Me. 1950, 93 F.Supp. 554, 558, in a case directly in point: "Equitable jurisdiction in the premises on the ground of a threatened irreparable injury which is clear and imminent is obvious, for the loss of a season's fishing can not be restored, and the State of Maine provides no means for recovering damages in money to compensate for the loss occasioned by an illegal deprivation of the right to fish commercially within its costal waters. (Citing case.) Nor do we see any occasion here for application of the doctrine of American Federation of Labor v. Watson, 327 U.S. 582 [583], 66 S.Ct. 761, 90 L.Ed. 873, for the Maine statutory provisions involved are clear and need no interpretation, and so far as we are aware no other special circumstance exists requiring the federal courts to stay action pending proceedings in the courts of the State."

eye glasses to return to the ophthalmologist in order to obtain a prescription for the replacement or duplication of an eye glass, or to place the burden upon the ophthalmologist of merchandising frames and mountings and other appliances, or placing that purely commercial monopoly in the optometrist. There is no rational basis for depriving the optician of the right to perform this purely mechanical and commercial service to the public.

I cannot agree, however, that the legislature of the state may not constitutionally prohibit any person, firm, company, corporation or partnership from soliciting the sale of frames, mountings, prisms, or any other instrument deemed essential and used in the field of visual care by enumerated methods of advertising when it does so for the declared purpose of vouchsafing the "best possible visual care" to the public.

The effect of the order of the court is to make it unlawful to advertise the sale of spectacles, eye glasses or lenses but to allow any person, firm, company, corporation or partnership to solicit the sale of the empty frames, mountings, prisms and other appliances or devices. By this method one so engaged may circumvent the very evil to which the legislation is aimed, namely, prohibiting dishonest and dangerous practices in the sale of optical goods and devices.

There can-be no doubt of the power of the legislature to regulate advertising practices of retail dealers of eye glasses. See State v. Rones, 223 La. 839, 67 So.2d 99, and cases cited at page 105. There may be good reasons for requiring the prohibition of advertising the sale of merchandise, the actual sale of which is not prohibited. Commonwealth v. Ferris, 305 Mass. 233, 25 N.E.2d 378. It is true that all of the statutes which have been upheld as a valid regulation or restriction on the advertising of the sale of eye glasses have been judicially construed to apply to the furnishing of optometrical services or actual visual care, and not the mere sale of frames, mountings or fittings as merchandise. But I entertain no doubt of the power of the legislature to regulate the advertising of the empty frames, mountings and prisms and other optical devices if the object of such legislation is the prevention of fraud or mistake or to protect the public against deceptive practices in the broad field of visual care. The power of the state to regulate or restrict advertising of a commercial business affected with a public interest has been upheld in a great variety of cases, including the sale of eye glasses. See Commonwealth v. Ferris, supra, 25 N.E.2d at page 380; Commonwealth v. Nutting, 175 Mass. 154, 55 N.E. 895, affirmed 183 U.S. 553, 22 S.Ct. 238, 46 L.Ed. 324; Ritholz v. Commonwealth, 184 Va. 339, 35 S.E.2d 210.

Considered in isolation, an eye glass frame or mounting is no more than a mere piece of merchandise. But considered in the context of the total field of visual care, it takes on a significant relationship to the visual needs of the public and ceases to be a mere piece of merchandise to be dealt with in the market place on an arm's length basis. As the dispenser of the completed eye glass the optician is a trained technician—the "right arm" of the ophthalmologist. As such he may be held to a standard more strict than the morals of the market place. Certainly the well-defined and legitimate functions he performs, both as a trained technician and a merchandiser, in the field of visual care are affected with a public interest, and the public may not be left to deal with him at arm's length. And it is the same with the merchant optometrist. Certainly in the eyes of the public the optometrist is not seen in his dual capacity of a merchandiser as to whom he is required to deal at arm's length, and a professional in whom he can place his trust and confidence.

The challenged act is a legislative scheme to effect one declared public policy and each of its parts ought to be considered in pari materia in determining whether or not the legislature has acted

beyond the scope of its broad and comprehensive police powers. Section 4 is pertinent, therefore, to the inquiry whether a valid constitutional basis can be found for prohibiting the advertisement of the merchandise not of itself related to visual care. Section 4 prohibits rebates, kick-backs, and solicitation by those selling optical goods, appliances or materials. And it forbids corporate practice. All of these we leave as proper subjects of police power. But the judgment of the court strikes down that part of the section which prohibits any retail establishment from renting space in its establishment to any person doing eye examinations or visual care. This prohibition in the statute is said not to bear any reasonable relationship to the admitted power of preventing corporate practice, or for that matter any other practice deemed not in the public interest.

I agree that on its face it seems unreasonable and irrational to deny to the professional man quarters in a retail establishment. But to me the undisputed facts in this case point up the very evil to which the legislation is aimed.

Ellis Carp is the owner or is interested in eighteen optical establishments in Texas. All of them are dispensing opticians. He is also interested in a supply house in Dallas where lenses are ground on orders from the dispensing opticians. In Texas, Mr. Carp employs persons on salary to refract the eyes of those who are induced to come to his optical establishments. By this method the dispensing optician solicits the business, refers the customers to the salaried employee who does the refracting and prescribes for the visual correction. The prescription is returned to the optician for filling, fitting and adjusting. So, the optical company operating under a trade name actually performs the optical services constituting the very corporate practice which Oklahoma legislation condemns and prohibits.

In Oklahoma, Mr. Carp owns and operates the Douglas Optical Company in Tulsa in space rented from the Zale Jewelry Company. The Douglas Optical Company is a dispensing optical company which advertises by all of the media condemned in the challenged legislation. Soon after the Douglas Optical Company commenced business, Dr. Rips, a licensed ophthalmologist, and formerly in the employ of Carp in Dallas, came to Tulsa; conveniently rented space in the Zale Jewelry Company and set himself up in practice. Admittedly all of the members of the public seeking visual care, who are induced to come to Douglas by its advertisements, are referred to Dr. Rips, and while no one is compelled to take Dr. Rip's prescription to Douglas, "most of them go there because they generally come from there."

Mr. Carp is also the president of a corporation known as the Lee Optical Company with ground floor offices in the American National Building in Oklahoma City. It employs advertising media condemned and prohibited in the legislation. Soon after the Lee Optical Company opened for business in Oklahoma City, Dr. Conti formerly employed by Carp in Texas to refract eyes, came to Oklahoma City and established himself in offices on the third floor of the American National Building. All of the members of the public who are induced to come to the Lee Optical Company for visual care are referred to Dr. Conti whose prescriptions usually find their way back to Lee Optical Company for filling.

While neither Conti nor Rips is employed by Lee Optical Company or Douglas Optical Company, and neither of them rebates for the referrals, the reciprocal arrangements enable them to completely commercialize the whole field of visual care, which we agree is affected with a public interest and subject to legislative control.

Under the order of the court, Douglas may continue to occupy space in Zale's Jewelry Company in Tulsa. Dr. Rips may continue to occupy space under the same roof. The Douglas Optical Com-

pany may continue to advertise frames and mountings and other optical devices by radio, television, classified ads, and by any other commercial means. It will continue to attract the unsuspecting public, who not knowing the difference between an optician, ophthalmologist, or optometrist, will undoubtedly find their way to Dr. Rips, who having prescribed will see that they are returned to Douglas in order to complete the cycle.

The loophole which this judgment leaves in the legislative scheme is wide and in my judgment glaring. It is an unwarranted interference with the police power of the state over a subject with which the state is fully competent to deal. To borrow the language of Mr. Justice Holmes: "We must be cautious about pressing' the broad words of the 14th Amendment to a drily logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the Bill of Rights. They more or less limit the liberty of the individual, or they diminish property to a certain extent. We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the states is limited by the Constitution of the United States, judges should be slow to read into the latter a nolumus mutare as against the lawmaking power." Noble State Bank v. Haskell, 219 U.S. 104, 110, 31 S.Ct. 186, 187, 55 L.Ed. 112.

In cases of this kind we ought to keep in mind the extremely limited restrictions that the due process clause of the Fourteenth Amendment places upon the states; and that federal courts should negatively inject themselves into the policy making powers of the states only in the presence of a palpable abuse of the due process clause of the constitution.

Sections 3 and 4 have uniform application and incidence to all affected thereby. There is no question of equal protection of laws involved. Only the question of due process under the Fourteenth Amendment is involved, and the basis of our jurisdiction is injunctive relief against the enforcement of a state statute with criminal sanctions. Before we rush in to strike down a part of the act, we ought to consider that due process in the state court is afforded to any person who would challenge any provision of the act by exposing himself to the criminal penalties involved. There is no more firmly established or salutary rule than the admonition against striking down the criminal laws of a state by federal injunctive process. Federal injunctive interference with the criminal laws of a state is justified only in exceptional circumstances and with a showing of great and immediate irreparable damage. Otherwise the accused should first set up a defense in the state court where his constitutional rights may be amply protected. See Watson v. Buck, 313 U.S. 387, 400, 61 S.Ct. 962, 85 L.Ed. 1416; Reed v. Lehman, 2 Cir., 91 F.2d 919; Starnes v. City of Milledgeville, D.C., 56 F.Supp. 956.

I would certainly stay the federal hand in respect to the enforcement of Sections 3 and 4 of the act. As to Section 2, while I have some misgivings about injunctive relief, I am clear on the issue of constitutionality.